1002

DARRELL PATRICK JOLLEY, Plaintiff-Appellee, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.

First District (5th Division)   No. 86—2516

Opinion filed February 19, 1988.

Lord, Bissell & Brook, of Chicago (Alvin E. Domash, David R. Schmidt, and Hugh C. Griffin, of counsel), for appellant.

Robert E. Harrington, Jr., Patrick J. Harrington, and John J. Naughton, all of Chicago (Henslee, Monek & Henslee and Harrington & Harrington, Ltd., of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, Consolidated Rail Corporation, appeals from a judgment awarding plaintiff, Darrell Patrick Jolley, $1,050,000 in a personal injury action brought by plaintiff under the Federal Employers' Liability Act (45 U.S.C. §51 (1982)) and the Federal Safety Appliance Act (45 U.S.C. §1 (1982)). On appeal, defendant contends: (1) the trial court erred in submitting plaintiff's Safety Appliance Act claim to the jury, thereby eliminating its contributory negligence defense; (2) the award of $1,050,000 is excessive for the injury claimed; and (3) newly discovered evidence illustrating the falsity of plaintiff's conduct and injury testimony mandates a new trial. For the reasons set forth below, we affirm.

The pertinent facts are as follows. Plaintiff was employed as a conductor by defendant railroad. On February 3, 1983, during a trip to Chicago from Pennsylvania, plaintiff was injured while riding in the caboose of defendant's train when a "run-in" of 100 freight cars occurred after the train's engineer applied the automatic brake to stop

the train at defendant's Westwood, Ohio, station.[1] Plaintiff testified at trial that the run-in occurred as a result of defective brakes on the train, as well as the negligence of defendant's engineer in failing to recharge the air brake system (*i.e.,* to pump sufficient air into the system) before leaving the railroad's Toledo station immediately preceding the Westwood station where the run-in occurred. According to railroad procedure, in order to determine if there is sufficient air in the air brake system, a "set-up and release" test must be performed. A set-up and release consists of a test of the brakes by the engineer in which the air brakes are applied just enough so that they can be observed visually and then released. Once proper pressure is reached, here 75 pounds, the conductor gives the engineer a "highball sign" to release the brakes and to move the train out of the station to its next destination.

The foregoing procedure was followed without incident at defendant's Fairlane station, the station immediately preceding the Toledo station, which in turn preceded the Westwood station. The procedure was not followed, however, before leaving the Toledo station. Instead, as plaintiff testified at trial, while he was on the rear platform of the caboose and his flagman, Leo Rogers, was on the ground nearby, he heard the air being pumped back into the air brake system and was waiting for the full recharge and the set-up and release test when the engineer, Barry Walker, suddenly and unexpectedly began to pull the train out of the Toledo station before the air brakes had been pumped up to the required 75-pound level, without doing a set-up and release, and without waiting for a go-ahead signal from plaintiff. Rogers reacted by immediately jumping onto the caboose and plaintiff went to get his radio from inside the caboose. Plaintiff then asked Rogers to look at the air gauge to see what the air pressure was, and Rogers responded that it read 45 pounds of air. Plaintiff also heard the wheels on the caboose "sliding" (*i.e.,* the wheels were not turning), which indicated that there was insufficient air pressure in the brakes to cause a release. Thereafter, plaintiff attempted to call Walker three times but received no answer. Although there was an emergency brake in the caboose to stop the train, plaintiff believed to use it was

---

[1]The automatic brake acts upon the air brakes which are located on each car of the train and are connected by a series of air hoses to a compressor in the engine which pumps air into the system. When the air brakes are applied, air is released, which moves a bar attached to the brake shoe on the wheel of each car. If the automatic brake is applied when there is insufficient air in the system, the brakes on the front end of the train will apply before the brakes on the rear end, causing a "run-in" or "slack action" in the rear of the train.

unsafe, *i.e.*, "about 20 different [damaging] things" could have happened to the train from tearing the train in half to derailment. As a result, plaintiff told Rogers to sit down at a table bolted to the floor and wall in the caboose and to brace himself, and plaintiff did the same. The train subsequently reached a speed of 20 to 25 miles per hour and, upon reaching the Westwood station, the engineer applied the air brakes to stop the train, but, because of the low pressure in the system, the rear of the train came to a slower stop than the front of the train, causing a run-in. The force of the stop tore the table off the wall; Rogers was propelled over the table into plaintiff; and plaintiff was hit in the upper body by the table which jammed down on his hands and arms, his shoulders hit the top of the seat, and his head hit the steel bulkhead.

Leo Rogers, plaintiff's flagman, testified similarly concerning the events leading up to the run-in of the railroad cars at the Westwood station.

Barry Walker, defendant's engineer, testified that according to the air flow gauge located in the engine, there was sufficient air in the air brakes to smoothly stop the train at Westwood. Specifically, Walker stated that prior to departing the Toldeo station he did not "get any response from the rear end, no radio response," so he used the same procedure he normally did in preparing to pull out of the station. He watched the air flow gauge and, based on the fact that he had less cars in the train than he had at the Fairlane station, which immediately preceded Westwood and where he had performed a set-up and release test without incident, he "figured when [he] got to the same place on the *** gauge [number 4] ***, which indicated that he should have a release on the rear end," it was all right to leave. Walker further stated that he applied the automatic brake all the way [to counteract any slack action] until he reached an "approach signal" before Westwood and then "pulled it on up to Westwood Avenue, just gradually *** decreasing the brake" until he stopped, which he considered to be a good stop, until the run-in.

After the stop at Westwood, the conductor of a new crew did a set-up and release test of the air brakes, the test was satisfactory, and the train proceeded on its route without further incident with the same equipment. Plaintiff and his crew were driven back to the Toledo station in a company car. Plaintiff, at his request, was then taken to a hospital emergency room where he was treated for a cut on a finger of his left hand and examined with respect to a pain in his neck area. During the next week, plaintiff visited his family doctor, complaining of numbness and pain in various parts of his body. A

week later, he complained to his doctor that he was experiencing numbness and throbbing in his right hand. His doctor referred him to Dr. William Fischer, an orthopedic surgeon. After examining plaintiff, Dr. Fischer concluded that plaintiff might be suffering from "carpel tunnel syndrome," a condition whereby the median nerve leading to all the fingers except the little finger and half of the ring finger becomes compressed by tendon and bone in the wrist space (carpel tunnel) leading to the hand. Dr. Fischer referred plaintiff to Dr. William Stromberg, an orthopedic surgeon specializing in hand injuries. He concurred in Dr. Fischer's diagnosis and subsequently performed a 45-minute out-patient surgery upon plaintiff's hand, removing excess tissue surrounding the nerve to relieve the pressure thereon.

The condition of plaintiff's hand seemed to improve for approximately a week following the surgery. Thereafter, however, plaintiff complained that the pain, numbness, stiffness, and lack of grip strength that he had had prior to the surgery returned. Subsequently, plaintiff gave up his employment with the railroad and became a real estate salesman. At trial, plaintiff testified that due to his complained-of injury he could not push open a door without experiencing a severe shooting pain; he could not grasp anything heavy without experiencing shooting pains; his loss of grip strength and numbness made it difficult for him to pick up small objects, button a shirt, hold a fork, or pick up his glasses; the stiffness in his wrist made it difficult to bend his wrist; he could not use his right hand to drive since it would become numb on the steering wheel; he could no longer play golf or toss a ball with his children; and he could not, in his opinion, throw a switch or set a hand brake as required in performance of his railroad employment. He also complained of various pains and numbness in his left hand, right elbow, and neck.

Based on plaintiff's continuing complaints and various tests, Dr. Stromberg subsequently concluded, and Dr. Fischer concurred, that plaintiff had suffered a 40% permanent disability to his right hand, rendering him unable to return to railroad work; plaintiff's grip strength in his right hand was 60 pounds per square inch, 40 pounds less than his grip strength in his left, nondominant hand, notwithstanding that plaintiff's right hand grip strength should have been at least 10 to 20 pounds greater than that in his left hand.

Plaintiff was also examined by three of defendant's orthopedic surgeons. They could not find any injury sufficient to preclude plaintiff from returning to his railroad work; they testified that all X rays of the right wrist were normal, grip strength was good, and there was no atrophy of the right arm, hand, or wrist.

With respect to plaintiff's damages, Charles Linke, an economist, calculated plaintiff's economic loss based upon what an average railroad worker plaintiff's age could be expected to earn from the time of plaintiff's injury until his expected retirement. Dr. Linke assumed that an average worker would retire at 58.4 years of age and that plaintiff's loss would amount to: $139,000 lost earnings prior to trial; $30,745 in fringe benefits lost prior to trial; $834,877 lost in future earnings; and $183,676 lost in future fringe benefits (or a total loss of $1,096,417). Linke's sums were arrived at by reducing the amounts by an average income tax rate which was 20% to 25% higher than plaintiff's actual tax rate. Linke also stated that assuming plaintiff could earn $20,000 per year as a real estate salesman and/or appraiser, his future lost earnings as a railroad worker could be reduced by 37% or $310,000.

At the conclusion of the trial, defendant moved for a directed finding in its favor on plaintiff's Safety Appliance Act claim, contending that plaintiff had failed to prove that there was anything defective or wrong with the train's brakes. Defendant's motion was denied and, over defendant's objections, the court gave the jury instructions on the Safety Appliance Act issue, as well as instructions pertaining to plaintiff's Federal Employers' Liability Act negligence claim. Thereafter, in answer to two special interrogatories, also given to the jury over defendant's objections, the jury expressly found against defendant on the Safety Appliance Act violation and, having been instructed that contributory negligence was not a damage-reducing factor under the Act, made no reduction in the $1,050,000 damages which it awarded to plaintiff. Although the jury was instructed not to use the negligence verdict form if they found no contributory negligence on plaintiff's part, the jury nonetheless wrote in "None" in the blank space for specifying the percentage of plaintiff's negligence and wrote in $1,050,000 for the amount of the verdict.

Defendant subsequently filed a motion for a new trial based upon newly discovered evidence, i.e., evidence that plaintiff was able to perform a full range of physical activities without favoring his right hand in any respect. The court denied the motion, and this appeal followed.

Defendant first contends that the trial court erred in submitting plaintiff's Safety Appliance Act claim to the jury because plaintiff failed to show that the train's brakes were defective. We disagree.

Section 1 of the Safety Appliance Act (45 U.S.C. §1 (1982)) provides:

"It shall be unlawful for any common carrier engaged in in-

terstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

Case law has interpreted this section to impose an absolute obligation upon railroads to equip their trains with power brake equipment in *efficient* operable condition and, if a breach of such obligation is the sole or contributory proximate cause of an employee's injury, the railroad is liable (*Rogers v. Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1957), 248 F.2d 710), without regard to negligence (*Selby v. Chesapeake & Ohio Ry. Co.* (1956), 11 Ill. App. 2d 395, 137 N.E.2d 657) or whether the brakes functioned properly before or after an unexplained malfunction (*Lewis v. Baker* (2d Cir. 1975), 526 F.2d 470; *Texas & Pacific Ry. Co. v. Griffith* (5th Cir. 1959), 265 F.2d 489), "the duty being an absolute one requiring proper performance on the occasion in question" (*Leveck v. Consolidated Rail Corp.* (1986), 148 Ill. App. 3d 118, 123, 498 N.E.2d 529; see also *Affolder v. New York, Chicago & St. Louis R.R. Co.* (1950), 339 U.S. 96, 94 L. Ed. 683, 70 S. Ct. 509; *Lewis v. Baker* (2d Cir. 1975), 526 F.2d 470).

■ Whether a railroad failed to equip its train with efficient brakes is a question for the jury. (*Texas & Pacific Ry. Co. v. Griffith* (5th Cir. 1959), 265 F.2d 489.) Two recognized methods of showing the inefficiency of brake equipment exist: "adducing evidence to establish some particular defect, or, showing a failure to function, when operated with due care, in the normal, natural and usual manner." (*Woods v. New York, Chicago & St. Louis R.R. Co.* (1949), 339 Ill. App. 132, 137, 88 N.E.2d 740; see also *Selby v. Chesapeake & Ohio Ry. Co.* (1956), 11 Ill. App. 2d 395, 137 N.E.2d 657.) This proof can be made either by direct or circumstantial evidence. *Selby,* 11 Ill. App. 2d 395, 137 N.E.2d 657.

Here, defendant argues there was no defect in the brakes and that they thus did not malfunction; rather, the run-in occurred and plaintiff was injured solely as a result of human error, *i.e.,* the engineer's negligence in failing to pump sufficient air into the air brake system, to perform a set-up and release test, and to wait for the plaintiff's "highball sign," as well as the plaintiff's own negligence in failing to apply the emergency brake located in the caboose immediately after he realized the air pressure was insufficient. On the other

hand, plaintiff argues that notwithstanding defendant's engineer's alleged negligence, the brakes were defective as evidenced by the engineer's testimony that he followed his *usual* procedure, when he could not contact plaintiff, in determining that there was sufficient air in the air brake system as indicated by his air flow gauge, and that he stopped the train in the usual manner by gradually decreasing the brake until he came to a stop.

■■ ■ Notwithstanding the fact that, as stated above, negligence is not a consideration in determining whether a violation of the Safety Appliance Act has occurred, defendant appears to have presented an argument which encompasses a theory of negligence and, correspondingly, lack of due care, under a proximate cause theory, *i.e.,* the engineer's failure to follow company rules, especially the performance of a set-up and release test, which culminated in the accident and plaintiff's injuries. We believe *Texas & New Orleans R.R. Co. v. Underhill* (5th Cir. 1956), 234 F.2d 620, is dispositive of this argument. In *Underhill,* the plaintiff was injured when he fell off a boxcar when it rammed into the engine. The defendant railroad company argued that the sole proximate cause of the plaintiff's injury was the plaintiff's failure to make a proper coupling and to insure that the coupling was joined by stretching the coupling properly, as required by the company's operating rules, *i.e.,* by having the engine move forward to test it immediately after the engine and boxcar first met. The plaintiff asserted that he made a proper coupling and thus it was unimportant that he did not perform the stretching test in the manner set forth by the company rules. The *Underhill* court pointed out, although the appeal was not submitted on the issue, that while under certain circumstances the failure to perform an act required by operational rules may be the sole proximate cause of an injury, that was not the case before it. Instead, it noted that the stretching procedure was not necessary to *make* a good coupling, but rather to *test* it (*i.e.,* if a good coupling was made, the stretching would have demonstrated that fact) and, therefore, it could not be said that the plaintiff's failure to perform the test was the proximate cause of his injury.

Like the plaintiff in *Underhill,* we do not believe in the instant case that the engineer's failure to perform the set-up and release test was the proximate cause of plaintiff's injury, since the test was not necessary to *pump* a sufficient amount of air in the brake system—the engine compressor was the means for doing so—but, rather, to *test* whether there was sufficient air in the system. We also briefly note that the engineer's failure to wait for a "highball sign" from plaintiff was not determinative of whether the engineer had pumped enough

air into the brake system, as he stated he had in reliance on *his* air flow gauge. This factor merely went to the engineer's credibility. Accordingly, like the court in *Underhill,* we cannot say that the engineer's failure to follow company operational rules was the proximate cause of plaintiff's injuries and, thus, we reject defendant's negligence-lack of due care-proximate cause argument.

In light of the above, therefore, we see no reason to disturb the jury's conclusion that the brake was inefficient. The jury apparently based its determination on the testimony of the engineer that he properly operated the brake in the normal, natural and usual manner, after his inability to contact plaintiff, and that the brake failed to efficiently work as a result of an unexplained malfunction, thereby proximately causing plaintiff's injury. We further observe that it was not necessary that plaintiff prove the cause of the malfunction (*Rogers v. Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1957), 248 F.2d 710), *i.e.,* from any particular defect, in order for the jury to find a violation of the Act where there was evidence that the brake was properly operated. (See *Carter v. Atlanta & Saint Andrews Bay Ry. Co.* (1949), 338 U.S. 430, 94 L. Ed. 236, 70 S. Ct. 226 (absence of a defect could not aid the defendant if a coupler was properly set and failed to couple on the occasion in question).) Accordingly, we hold that plaintiff was not required to show a specific defect and the trial court properly submitted this claim to the jury.

We also reject the second prong of defendant's contention on this issue, *i.e.,* that by submitting the Safety Appliance Act claim to the jury its contributory negligence defense was eliminated. Specifically, defendant argues that because of the special interrogatories submitted to the jury on the Safety Appliance Act claim, under which the jury was instructed that contributory negligence is not a damage-reducing factor, the jury mistakenly filled out the comparative negligence verdict form *to be consistent* with its answers to the special interrogatories. That the jury was confused, defendant contends, is supported by the fact that it was not to use the comparative negligence verdict form unless it found that plaintiff was contributorily negligent.

Although we recognize that the jury was mistaken in filling out the negligence verdict form if it believed plaintiff was *not* contributorily negligent, we do not believe its answers on that form were based on a desire to be merely consistent. At trial, defendant's theory of plaintiff's contributory negligence was competently presented to the jury and the comparative negligence verdict form submitted to it clearly explained the concepts involved. We cannot believe, therefore,

that the jury was confused or that it would sacrifice any conviction it held that plaintiff was contributorily negligent for the sake of consistency. We further note that common sense suggests that if the jury was confused, it would have sought clarification from the court, rather than seek consistency for the sake of consistency. In any event, a finding by the jury of defendant's violation of the Safety Appliance Act and that it was the sole or contributorily proximate cause of plaintiff's injuries was sufficient to entitle him to recover under that Act. See *Rogers v. Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1957), 248 F.2d 710.

▮▮ Defendant next argues that the award of $1,050,000 in damages was excessive for the injury claimed. As this court stated in *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 359, 484 N.E.2d 542:

> "An award of damages is excessive and unfair if the amount falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. Damages are particularly within the province of the trier of fact and a reviewing court will not disturb them on appeal unless obviously the result of passion or prejudice. [Citation.] The reviewing court should examine such factors as the primacy and extent of the injuries suffered, plaintiff's age, the possibility of deterioration in the future, the medical expenses incurred, past and future wage losses and any restrictions that the injuries may have placed on the daily activities of the plaintiff. [Citation.]"

Here, defendant called no witnesses to calculate plaintiff's past and future economic losses but, on appeal, argues that plaintiff's expert made his calculations on an assumption that plaintiff "would never again do a day's work of any kind for the rest of his life or earn another penny from any job," notwithstanding the fact that plaintiff would be able to work at sedentary occupations[2] and had, prior to trial, embarked on a "successful" career as a real estate

---

[2]It is unclear what argument defendant is making with respect to the fact that plaintiff allegedly earned "substantial" amounts of money from his additional sedentary jobs as a union chairman and as an advisor to union members through his attorneys' law firm. It appears that defendant is suggesting that plaintiff's alleged ability to continue in these jobs should have been considered in determining his future earning potential. In the absence of clarity of the argument and based upon the fact that the record does not indicate one way or the other whether plaintiff could have continued performing these jobs after terminating his railroad employment, we do not address this matter further.

salesman and appraiser with unlimited income potential.

We first observe that although defendant cites to the record in support of its allegation that plaintiff's economist based his calculation of plaintiff's losses on an assumption that he would never work again, we find no language in the cited page evidencing this purported assumption and, in fact, we find the opposite to be true; plaintiff's expert did calculate plaintiff's potential earnings in another occupation as a real estate salesman.

We further observe that plaintiff was 39 years old at the time of his injury. His economic loss was calculated upon the "average" conductor's past and future earnings and fringe benefits until retirement at 58.4 years of age, which were less than his own, and the amounts were reduced by an average income tax rate. The jury also heard evidence that these amounts could be further reduced by 37% ($310,000) based upon what a "starting" real estate salesman might earn per year ($20,000). Plaintiff's medical experts testified that he had suffered a loss of grip strength, a 40% permanent disability, which rendered him unable to perform his railroad duties, and that the changes in his hand nerves were getting progressively worse and would deteriorate in the future. A portion of the jury's award was apparently for intangible damages—past and future pain and suffering and for the permanency of the disability. Plaintiff's economic experts also considered any interest to be earned on the damages and reduced the future economic loss to the present value as required by law. Based upon this evidence, we believe that the award of damages lies within the realm of reasonable compensation.

■■ ■ Defendant's final argument is that newly discovered evidence mandates a new trial. Specifically, the evidence, which was obtained approximately 2½ months following trial, between May 26 and July 4, 1986, consists of four video tapes taken by defendant's investigator showing plaintiff performing the following activities with his right hand: scraping old paint off his house; applying window caulking; picking weeds out of his garden; opening a car door and trunk; shaking hands; pumping gas; pounding on a paint can; smoking a cigarette; opening his house doors; pushing and pulling a long pole (apparently a pool cleaning device); carrying and lifting bags of charcoal and dragging his charcoal grill; combing his hair; carrying a briefcase; raking and hoeing his garden; lifting flower pots; pushing a cart; carrying lawn furniture; and painting his outdoor steps. Defendant contends that this evidence shows that plaintiff in fact suffered no injury and is not disabled. Defendant requests that this evidence be contrasted with plaintiff's conduct and testimony at trial, *i.e.*, that he

could not use his right hand to push open a door or to grasp small objects without difficulty, that his right wrist was stiff and difficult to bend, that he could not use his right hand to drive or to toss a ball and, during trial, he demonstrated his claimed disability by keeping his right hand in his pocket throughout almost the entire trial and refused to use it for the most mundane tasks of opening a door, smoking a cigarette, or shaking hands. Defendant further contends that this evidence demonstrates not only the falsity of plaintiff's conduct and testimony at trial, but also the falsity of his subjective physical complaints upon which his physicians based their opinions concerning his disability.

As this court stated in *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 839, 462 N.E.2d 645, "[t]he basic requirements for a new trial on the basis of newly discovered evidence are that the newly discovered evidence be (1) of such conclusive character that it will probably change the result if a new trial is granted, (2) discovered since the trial, (3) such that it could not have been discovered before trial with the exercise of due diligence, (4) material to the issue and (5) not merely cumulative to the evidence at trial. [Citation.] The party seeking the new trial has the burden of showing that these requirements have been met."

We believe the facts in the present case clearly indicate that defendant failed to satisfy what we consider the most significant requirement under the circumstances—the exercise of due diligence. During the three years prior to trial, defendant's investigator only conducted spot checks on plaintiff's home on six occasions—twice in February 1985, twice in March and April of 1986 (each of which lasted 15 to 20 minutes), and two other times in 1986 when he "drove by" while engaged in other investigations. Defendant's investigator testified that on none of the six occasions did he observe plaintiff or any activity (home repairs being made or yard work) upon the premises. Defendant has offered no explanation for not conducting additional, in depth surveillance prior to trial in light of the fact that its investigator had been unable to observe any activity by plaintiff and, accordingly, we find it failed to exercise due diligence in discovering evidence that could have been discovered prior to trial.

We also briefly note that the video tapes do not indicate whether plaintiff is or is not experiencing pain during his performance of the various activities and, in any event, those activities do not require the same grip strength required in his employment as a railroad conductor, *i.e.*, pushing drawbars which weigh approximately 300 pounds, climbing on and off moving railroad cars, turning handbrakes to stop

1014

a moving car, coupling frozen air hoses, and carrying 80-pound knuckles.

For the reasons set forth above, therefore, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ, P.J., and SULLIVAN, J., concur.