Docket No. 100261.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS


MARY L. DeSMET, as Personal Representative of the Estate of Doris F. Hays, Deceased, Appellant, v. THE COUNTY OF ROCK ISLAND, Illinois, *et al.*, Appellees.

*Opinion filed April 20, 2006.*


JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride and Garman concurred in the judgment and opinion.

Justice McMorrow dissented, with opinion.


**OPINION**

The plaintiff, Mary L. DeSmet, as personal representative of the estate of the decedent, Doris F. Hays (Hays), filed a multicount complaint in the circuit court of Rock Island County naming several local governmental entities, and their various employees, parties defendant. Plaintiff's complaint alleged that each violated a duty to the plaintiff's decedent and was liable to plaintiff pursuant to the provisions of the Survival Act (755 ILCS 5/27–6 (West 2002)) and the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2002)). All defendants moved to dismiss, arguing that they owed no duty to Hays and they were, in any event, immune under the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/1–101 *et seq.* (West 2002)). Although the defendants raised the applicability of several sections of the Act, all specifically argued they were immune from liability under the provisions of section 4–102 of the Act (745 ILCS 10/4–102 (West 2002)). After a hearing, the circuit court dismissed plaintiff's complaint with prejudice, ruling that section 4–102 immunity applied. Plaintiff timely filed notice of appeal, and the appellate court affirmed. No. 3–03–0964 (unpublished order under Supreme Court Rule 23). We granted the plaintiff's petition for leave to appeal (177 Ill. 2d R. 315), and now affirm the judgment of the appellate court.

## BACKGROUND

The record, for purposes of the motions to dismiss,[1] reflects that on April 5, 2002, Doris Hays was driving her vehicle on U.S. Route 150 in rural Rock Island County when it left the

---

[1]For purposes of clarification, we note that the facts set forth herein are taken from plaintiff's first amended complaint and a transcript of interagency calls published in a newspaper article that plaintiff attached as an exhibit to her response to defendants' motions to dismiss. The article itself acknowledges that the "transcript does not precisely reflect the audio-taped version of the calls." One of the defendants, in reply to plaintiff's response, refused to concede the accuracy of the transcript, and another argued that the exhibit should be stricken; however, both stated they were willing to assume its accuracy for purposes of the motions to dismiss. We will do so as well.

road and ran into a ditch. A passing motorist witnessed the vehicle's departure from the roadway and used her cell phone to report her observation to Lori Sampson, clerk of the Village of Orion. After Sampson received that telephone call, she phoned Christine Wrigley, the dispatcher for Henry County.

Sampson told Wrigley that she had received a call from a motorist who said she had witnessed a vehicle traveling at a high rate of speed go off Route 150 in Rock Island County, just over the Henry County/Rock Island County line. Wrigley asked Sampson: "Okay, did they wreck?" Sampson replied that the caller "said she believed they had to of because they were traveling at such a high rate of speed." Sampson noted that the caller had not stopped to verify that the vehicle had wrecked, stating, "She continued on her way." Sampson told Wrigley that she did not have a vehicle description; however, she described the area that the caller had referred to as just over the Rock Island County line, "where the couple of houses are at in the ditch where it's such a mess and they've got all that junky equipment and so on." Wrigley then told Sampson she would contact Rock Island County.

Instead of contacting Rock Island County, however, Wrigley notified the City of Moline and the City of East Moline via the Moline-East Moline Dispatch Center (Dispatch Center). Wrigley informed dispatcher Debra Roman that she had received a report of a vehicle "down in the ditch" on Route 150 "at the Rock Island, Henry County line *** on the Rock Island County side by two houses with a lot of junk in the yard." Wrigley indicated she did not have a vehicle description.

Roman then telephoned Rock Island County at its sheriff's department and reported the incident to Myrtle DeWitte, a dispatcher for Rock Island County. The following conversation ensued between the Dispatch Center and Rock Island County:

> "Rock Island County dispatcher Myrtle DeWitte: Radio, Sergeant DeWitte.
>
> Moline-East Moline dispatcher Debra Roman: Hello, Myrtle, this is Deb at Moline.
>
> DeWitte: Hi.
>
> Roman: Henry County called.

DeWitte: Um hum.

Roman: To tell me about a vehicle in the ditch.

DeWitte: Okay.

Roman: On Route 150.

DeWitte: Uh huh.

Roman: And it's right at the Rock Island County, Henry County line.

DeWitte: Oh, heaven forbid they would handle it.

Roman: Well, I know.

DeWitte: Okay.

Roman: They call us instead of calling you.

DeWitte: (Laughter) Okay, what kind of vehicle, did they say?

Roman: Uh, no they didn't know, this is a third party call.

DeWitte: Okay.

Roman: By some houses or something that, couple houses that have a bunch of junk in the yard.

DeWitte: Oh, okay, we'll check on it.

Roman: Ya, that'll, that'll narrow it.

DeWitte: Ya, that'll get it for us.

Roman: Ya.

DeWitte: Okay, thanks."

None of the parties contacted responded to the scene on the day the calls were made. On that day, Doris Hays' family also notified Rock Island County that she was missing. Three days later, Hays' body was found lying outside her vehicle at the scene of the accident.

On March 3, 2003, plaintiff, Mary DeSmet, as personal representative of the estate of the decedent, Doris F. Hays, filed a 24-count complaint in the circuit court of Rock Island County naming as parties defendant: Rock Island County; Michael Grehan, the sheriff of Rock Island County; Myrtle DeWitte, a dispatcher for Rock Island County; Henry County; Gilbert Cady, the sheriff of Henry County; the Village of Orion; Lori Sampson, clerk of the Village of Orion; the City of Moline;

the City of East Moline; the Moline-East Moline Dispatch Center; Debra Roman, dispatcher for the Dispatch Center; and Steven Etheridge, the police chief of the City of Moline. Plaintiff was subsequently granted leave to file an amended complaint. Defendants thereafter filed motions to dismiss plaintiff's amended complaint pursuant to section 2–619 of the Code of Civil Procedure (735 ILCS 5/2–619 (West 2002)), relying principally on section 4–102 of the Tort Immunity Act (745 ILCS 10/4–102 (West 2002)). Various defendants also relied on the public duty rule, as well as sections 2–106, 2–109, 2–201, 2–204, 2–210, 2–212, 3–108, and 5–101 of the Tort Immunity Act (745 ILCS 10/2–106, 2–109, 2–201, 2–204, 2–210, 2–212, 3–108, 5–101 (West 2002)), and section 3.150 of the Emergency Medical Services (EMS) Systems Act. 210 ILCS 50/3.150 (West 2002).

At the hearing on the motions to dismiss, in response to certain arguments raised by defendants, the plaintiff suggested that the complaint "alleged facts sufficient to show willful and wanton conduct." When the circuit court observed that the complaint "specifically used the word 'negligence' " and that it "looks to be pled in negligence," counsel for plaintiff responded, "[T]hat being noted, if this court was inclined to make a ruling today or in the future based on the words of negligence in there, we would ask to amend it to just change those words, even though the facts we think are sufficient." The circuit court agreed that point was "easily cured by amendment." However, the court was never presented with a written motion to amend, and it did not make a ruling on the plaintiff's offer to do so. The circuit court ultimately dismissed plaintiff's complaint with prejudice, ruling that section 4–102 immunized all defendants.

On appeal, plaintiff contended that the circuit court erred in granting defendants' motion to dismiss, arguing that (1) the immunity provided by section 4–102 of the Act was not available to the defendants; (2) the "public duty rule" does not apply to this case; and (3) the defendants voluntarily undertook a duty to help Hays when they each received telephone calls informing them of the accident and then forwarded this information to another party. The appellate court held that

˘5˘

section 4–102 immunity applied to all defendants. Consequently, the court determined there was no need to address plaintiff's other issues. No. 3–03–0964 (unpublished order under Supreme Court Rule 23).

## ANALYSIS

At the outset, we note that immunity under the Tort Immunity Act is an affirmative matter properly raised in a section 2–619 motion to dismiss. Governmental entities bear the burden of proving their immunity under the Act. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). When a court rules on a section 2–619 motion to dismiss, it must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. *Van Meter*, 207 Ill. 2d at 367-68, quoting *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997). Our review of a section 2–619 dismissal is *de novo*. *Van Meter*, 207 Ill. 2d at 368.

Before this court, plaintiff presents three issues for our consideration, all of which concern the applicability of section 4–102 of the Act. We set forth those issues precisely as plaintiff has phrased them: (1) whether a municipality that sends no assistance whatsoever in response to a request for help at an accident scene can claim the immunity provided by section 4–102 of the Tort Immunity Act for failure to provide adequate police or service; (2) whether a call placed for help at an accident scene automatically triggers a police search rather than a paramedic response, thus triggering the immunity of section 4–102 for failure to provide adequate police services, or whether such a call instead simply triggers a duty to send rescue personnel, whose misconduct is not shielded by section 4–102; and (3) whether *Doe v. Calumet City*'s recognition of a willful and wanton exception to the immunity otherwise provided by section 4–102 for injuries resulting from failure to provide adequate police service remains good law and applies in this instance. Additionally, in response to defendants' argument that they owed no duty to plaintiff's decedent because of the "public duty rule," plaintiff argues, alternatively, that the rule is "an anachronism and should be abolished," or the "rule is actually an immunity provision."

Under the facts of this case, we hold that section 4–102 of the Act provides immunity for defendants. Given that determination, we deem it unnecessary to clarify the nature and continued viability of the public duty rule in this context.

In Illinois, governmental entities were originally immune from tort liability under the doctrine of sovereign immunity. This court abolished sovereign immunity in 1959. See *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). In response to this court's decision in *Molitor*, the legislature enacted the Local Governmental and Governmental Employees Tort Immunity Act in 1965. *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 43 (1998); *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386 (1996). As we noted in *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001), the purpose of the Act is to protect local public entities and public employees from liability arising from the operation of government. " 'By providing immunity, the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims.' " *Village of Bloomingdale*, 196 Ill. 2d at 490, quoting *Bubb v. Springfield School District 186,* 167 Ill. 2d 372, 378 (1995).

The ratification of the Illinois Constitution of 1970 validated both *Molitor* and the Tort Immunity Act. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 344 (1998). As we observed in *Harinek*, article XIII, section 4, of the Illinois Constitution now makes the General Assembly the ultimate authority in determining whether local units of government are immune from liability. *Harinek*, 181 Ill. 2d at 344-45.

Some decisions of this court have indicated that the "common law public duty rule" survived the abolition of sovereign immunity and the enactment of the Tort Immunity Act. See *Zimmerman*, 183 Ill. 2d at 44-45, citing approvingly *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968) ("Independent of statutory or common-law concepts of sovereign immunity, the general rule is that a municipality or its employees is not liable for failure to supply general police or fire protection. [Citations.] This rule has been maintained in the face of decisions holding municipalities liable for affirmative negligent or wilful acts by their employees"). In *Zimmerman*,

this court explained the rule and its purpose:

> "The public duty rule establishes that 'a municipality or its employees is not liable for failure to supply general police or fire protection.' *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968). The rationale behind the nonliability principle of the public duty rule is that a municipality's duty is to preserve the 'well-being of the community' and that such a duty is 'owed to the public at large rather than to specific members of the community.' *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987)." *Zimmerman*, 183 Ill. 2d at 44.

*Schaffrath,* cited approvingly in *Zimmerman*, provides additional insight into the rationale for the public duty rule as it pertains to police protection: "The duty of the police to preserve the well-being of the community is owed to the public at large rather than to specific members of the community. [Citation.] This rule rests upon public policy considerations that a police department's negligence, oversights, blunders or omissions are not the proximate or legal cause of harms committed by others. A general duty would put the police in the position of guaranteeing the personal safety of every member of the community." *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987).

As noted, in addition to explaining the rule and its purpose, this court, in *Zimmerman*, also affirmed the continuing viability of the public duty rule:

> "In *Huey*, this court determined that the public duty rule remained viable, even after the passage of the Tort Immunity Act, on the basis that the rule existed '[i]ndependent[ly] of statutory or common-law concepts of sovereign immunity.' *Huey*, 41 Ill. 2d at 363.
>
>    \*\*\*
>
> This court's holding in *Huey* that the public duty rule exists '[i]ndependent[ly] of statutory *or* common-law concepts of sovereign immunity' (emphasis added) (*Huey*, 41 Ill. 2d at 363) establishes that neither this court's decision in *Molitor* abolishing sovereign immunity, the General Assembly's passage of the Tort

Immunity Act, nor the ratification of the 1970 Illinois Constitution altered the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." *Zimmerman*, 183 Ill. 2d at 45.

Finally, this court, in *Zimmerman*, observed that " 'the existence of a duty and the existence of an immunity are separate issues.' " *Zimmerman*, 183 Ill. 2d at 45, quoting *Barnett*, 171 Ill. 2d at 388. In *Zimmerman*, this court stated, " '[u]nlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was any enforceable duty to the plaintiff in the first place.' " *Zimmerman*, 183 Ill. 2d at 46, quoting 18 McQuillin on Municipal Corporations §53.04.25, at 165 (3d rev. ed. 1993). Assuming the continued viability of the public duty rule, defendants in this case assert, *inter alia*, that they owed no duty to Hays, so the issue of immunity is never reached.

While *Zimmerman* and subsequent cases continue to reference and apply the public duty rule in various contexts (see *Sims-Hearn v. Office of the Medical Examiner*, 359 Ill. App. 3d 439, 443-46 (2005); *Alexander v. Consumers Illinois Water Co.*, 358 Ill. App. 3d 774 (2005)), in the context of police protection services, this court's comments lend support to *plaintiff's* contention that the public duty rule has been codified in section 4–102 of the Tort Immunity Act–as an immunity. Indeed, this court apparently acknowledged as much in *Aikens v. Morris*, 145 Ill. 2d 273 (1991), when it referred to "the common law blanket immunity, codified in section 4–102, which immunizes a municipality and its employees for the failure to provide police protection." *Aikens*, 145 Ill. 2d at 282 ("Section 4–102 immunity may apply in the context where police officers are simply 'providing [or failing to provide] police services' "); see also *Hernandez v. Kirksey*, 306 Ill. App. 3d 912, 915 (1999) (section 4–102 codifies the common law public duty rule). In *Aikens*, this court explained:

"We note, *** in an effort to preserve the clarity of our jurisprudence, that section 4–102 of the Tort Immunity Act codifies the separate common law rule

that municipalities or their employees are not liable for failure to supply police or fire protection. This long-standing rule survived *Molitor*. (See *Huey v. Town of Cicero* (1968), 41 Ill. 2d 361, 363.) Under the rule, a police department's duty to preserve the well-being of the community is owed to the public at large, rather than specific individuals. [Citations.] The duty is so limited because of strong public policy considerations which seek to avoid placing police departments in the untenable position of guaranteeing the personal safety of each individual in the community." *Aikens*, 145 Ill. 2d at 278 n.1.

This court's comments in *Aikens* suggest, as plaintiff argues, that the public duty rule, at least in this context, has been incorporated into the Tort Immunity Act as an "immunity."

However, the current status of the public duty rule is not a point this court must resolve in this case because, even if these " 'governmental units are liable in tort on the same basis as private tortfeasors' " (*Village of Bloomingdale*, 196 Ill. 2d at 490, quoting *In re Chicago Flood Litigation*, 176 Ill. 2d at 192), we find that section 4–102 immunity applies in any event. It is our prerogative to forgo the determination of issues unnecessary to the outcome of a case. See *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 326-27 (1995) (acknowledging "the public duty doctrine, a common law immunity based on public policy," but declining to reach the issue of the rule's applicability); *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 417-18 (1989); see also *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 288 (2001) (Freeman, J., specially concurring, joined by McMorrow, J.). As we may reject an ineffective assistance of counsel claim in a criminal case on the basis of lack of prejudice, assuming counsel's deficient performance, *arguendo*, for purposes of analytical expedience (see *People v. Ceja*, 204 Ill. 2d 332, 358 (2003)), so may we assume a defendant owes a duty, for the sake of analysis, in order to expedite the resolution of an immunity issue.

We now address the central issue presented by plaintiff's appeal, *i.e.*, whether the circuit court erred in dismissing

plaintiff's complaint with prejudice on the basis of section 4–102 of the Tort Immunity Act. Section 4–102 provides in pertinent part:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service *** ." 745 ILCS 10/4–102 (West 2002).

When construing a statute, this court must, if possible, give effect to each paragraph, sentence, clause, and word. *People v. Maggette*, 195 Ill. 2d 336, 350 (2001). A court should construe a statute, if possible, so that no term is rendered superfluous or meaningless. *Maggette*, 195 Ill. 2d at 350. In interpreting an immunity provision, our primary goal is to ascertain and give effect to the intention of the legislature. We seek that intent primarily from the language used in the Tort Immunity Act. *Barnett*, 171 Ill. 2d at 388. Where an enactment is clear and unambiguous, we are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express. *Village of Bloomingdale*, 196 Ill. 2d at 493, quoting *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). This court may not legislate, rewrite or extend legislation. If a statute, as enacted, seems to operate in certain cases unjustly or inappropriately, the appeal must be to the General Assembly, and not to this court. *Village of Bloomingdale*, 196 Ill. 2d at 494, quoting *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 522 (2000).

Section 4–102, the immunity statute at issue, is couched in the disjunctive. The pertinent portion of the statute contains three clauses separated in two locations by the term "or." The statute, by its terms, immunizes local public entities and public employees from liability for failure to (1) establish a police department *or* (2) otherwise provide police protection *or* (3) if police protection service is provided, for failure to provide *adequate* police protection service. While the wording and context of other less comprehensive provisions of the Tort Immunity Act might warrant a different interpretation (see

*American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 280-81 (2000) (interpreting section 5–101 of the Act, which fails to address *inadequate* governmental protection)), if we were to interpret section 4–102 in any other way than the tripartite manner indicated, we would be excising one of the three aforementioned clauses from the statute as written by the legislature. We do not possess that authority. *Village of Bloomingdale*, 196 Ill. 2d at 494.

We first address plaintiff's claim that section 4–102 does not apply because "there was no particular need for police assistance." Plaintiff notes that the call for assistance did "not target any particular type of governmental agency" and maintains that "the nature of the call suggests that at least one non-police agency would be an appropriate responder." Plaintiff's attempt to circumvent the application of section 4–102 is unavailing.

We again examine the essential facts provided in plaintiff's complaint and response. One has to assume that Lori Sampson accurately conveyed the information given her by the anonymous caller, because there is nothing in the record to the contrary. Sampson told Christine Wrigley, the Henry County dispatcher, that someone had witnessed a vehicle go off Route 150 at a high rate of speed and, because of its speed upon departure from the road, the witness speculated that the vehicle must have wrecked. Sampson described the location with specificity and indicated that it was in Rock Island County. Wrigley, in turn, contacted Debra Roman at the Dispatch Center, informing her of the vehicle's location, but telling her only that there was a vehicle "down in the ditch." Wrigley did not mention the speed at which the vehicle was traveling when it left the roadway, and she did not convey any assumptions regarding an accident or injuries. It was that information which Roman passed on to Rock Island County's dispatcher, Myrtle DeWitte. Consequently, authorities in Rock Island County, the county in which accident actually occurred, knew only that there was "a vehicle in the ditch." Thus, plaintiff's factual allegations, stripped of unsupported speculation, conclusions and characterizations, indicate that the defendants, collectively, failed to respond to an anonymous report of a *possible*

ˇ12ˇ

accident or "vehicle in the ditch." Nothing in the motorist's report *confirmed* that an accident had in fact occurred or that anyone was injured. Plaintiff bases her case upon this failure to respond to an anonymous, unconfirmed report of a possible accident.

Appellate panels have held that "police protection service" under section 4–102 is implicated where police are called upon to assist or locate motorists who have driven off the roadway. See *McElmeel v. Village of Hoffman Estates*, 359 Ill. App. 3d 824, 827-29 (2005); *Kavanaugh v. Midwest Club, Inc.*, 164 Ill. App. 3d 213, 221 (1987). We agree with those decisions insofar as they hold that the assistance required in such situations falls within the statutory umbrella of "police protection services." We therefore reject plaintiff's argument that the caller's report required an immediate emergency medical response. Until the police had determined that an accident had in fact occurred, and that there were injuries associated with the accident, an emergency medical response was not indicated. Consequently, section 4–102 applies in the first instance, rather than some other statutory provision of the Tort Immunity Act.

Plaintiff next contends "[w]here a municipality receives a call for emergency assistance but fails to respond, and that failure is the consequence of human error rather than any exercise of discretion, Section 4–102 of the Tort Immunity Act is not implicated." Plaintiff suggests that the "legislature did not intend to shield municipalities from liability caused by a complete and inexcusable failure to act." She argues: "[T]here was no failure to provide *adequate* police service, the conduct that 4–102 addresses. Instead, there was a complete absence of *any* police service, and 4–102 does not address that situation." (Emphases in original.)

In passing, we note that plaintiff's reference to "human error" suggests an assertion of negligence (see *Jolley v. Consolidated R. Corp.*, 167 Ill. App. 3d 1002, 1008 (1988) (equating "human error" with "negligence")), as opposed to the "utter indifference to or conscious disregard for the welfare" of another that are the hallmarks of willful and wanton conduct. See *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 28

(2004). Plaintiff's attribution of defendants' failure to respond to "human error" is consistent with the allegations of "negligence" in her complaint. Notwithstanding this characterization, for purposes of analysis, we will treat the complaint as if it alleged either negligence or willful and wanton conduct. As we will explain hereafter, it was properly dismissed in either event.

First, we reject plaintiff's attempt to equate the failure to "respond" to the report in this case with a failure to provide "*any* police service" for purposes of section 4–102. Although section 4–102 of the Act does immunize a local public entity for its "failure to establish a police department or otherwise provide police protection service" (745 ILCS 10/4–102 (West 2002)), that portion of the statute is not at issue here because the record in this case clearly shows that these governmental defendants rendered police protection service to the general public via their dispatch centers. The dispatch services simply proved inadequate in this instance insofar as they failed to deliver personalized police services to the scene in a timely manner. The allegations of plaintiff's complaint bear this out.

Plaintiff alleges that the defendants "[f]ailed to train and supervise *** employees" and "failed to have in force procedures which would ensure that all emergency calls for assistance are responded to in a timely fashion." Those allegations implicate the structural adequacy of police protection services that defendants provided to the general public. In essence, plaintiff alleges that those inadequacies resulted in a failure "to obtain sufficient information concerning decedent's motor vehicle accident," a failure "to timely dispatch appropriate law enforcement personnel," and a failure "to timely dispatch emergency medical personnel." Thus, plaintiff's allegations implicate the adequacy of services provided to the general public–services that are intended to determine whether and when police officers will be dispatched into the community in response to specific calls for assistance. As we will explain hereafter, when officers do respond to the scene of a call for assistance, different rules of immunity may apply; however, section 4–102 governs in the circumstances before us.

Moreover, since section 4–102 contains no exception for willful and wanton misconduct, that section would immunize

defendants even *if* we were to accept plaintiff's argument that the facts alleged in her complaint support that characterization. As we noted in *Village of Bloomingdale*, and our prior decisions discussed therein, when the legislature intends to limit an immunity provision to cover only negligence and not willful and wanton misconduct, it has " 'unambiguously done so.' " *Village of Bloomingdale*, 196 Ill. 2d at 491, quoting *Barnett*, 171 Ill. 2d at 391. When the plain language of an immunity provision in the Tort Immunity Act contains no exception for willful and wanton misconduct, we have reasoned that the legislature " 'intended to immunize liability for both negligence and willful and wanton misconduct.' " *Village of Bloomingdale*, 196 Ill. 2d at 491, quoting *Barnett*, 171 Ill. 2d at 391-92. This court applied that reasoning in *Harinek* and *Chicago Flood Litigation* to hold that section 2–201 of the Tort Immunity Act immunized defendants against allegations of willful and wanton misconduct. *Harinek*, 181 Ill. 2d at 347; *In re Chicago Flood Litigation*, 176 Ill. 2d at 196. Identical reasoning was utilized in *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 395 (1998), and *Barnett*, 171 Ill. 2d at 391-92, en route to holdings that the version of section 3–108 then in effect afforded "full immunity." *Barnett*, 171 Ill. 2d at 393. The analysis employed in those decisions compels the same conclusion in this case.

Section 4–102 of the Act is comprehensive in the breadth of its reach, addressing situations where no police protection is provided to the general public and those in which inadequate protection is provided. Moreover, section 4–102 contains no exception for willful and wanton misconduct. We hold, given the facts of this case, that section 4–102 immunizes defendants against both negligence and willful and wanton misconduct.

Plaintiff, however, submits that this court, in *Doe v. Calumet City*, 161 Ill. 2d 374 (1994), recognized a willful and wanton exception to the immunity otherwise provided by section 4–102, and she suggests that the exception applies to the facts of this case. To the extent that *Doe* still represents good law, we hold it is inapplicable under these circumstances, where the police failed to respond to the scene of a possible accident. Since this court's decision in *Doe* cannot be properly understood without reference to the outrageous conduct

alleged of the supervising police officer in that case, we set forth the facts at some length.

Jane Doe and her two children, Betty and John, were the victims of a home invasion accompanied by violent assaults. The intruder, Valentine, first sexually assaulted Jane and threatened to kill her. Jane subsequently escaped from her apartment and struggled with Valentine on the stairwell of her building. During the course of that struggle, Valentine beat Jane and again threatened to kill her. Valentine eventually left Jane on the stairwell, reentered her apartment–where Jane's children were still located–and locked the door behind him. Jane, clothed only in undergarments, then left the building screaming. Several neighbors heard the screams and dialed 911. Officer Horka was one of several officers to arrive at the scene, and he assumed a supervisory role.

Officer Horka asked Jane what had happened. Jane told him that there was a man in her apartment, and that the man had tried to rape her and had threatened to kill her and her children. Jane also told Horka that her children were still in the apartment and she feared for their safety. Jane pleaded with Horka to break down the door and rescue her children. Several neighbors also pleaded with the officers to break down the door. However, Officer Horka declined to break down the door, stating that he did not want to be responsible for the property damage. Jane repeatedly stated that she would pay for any damage and screamed that she herself would save her children. When Jane attempted to rescue her children, several defendant police officers ordered her to stay put and then physically restrained her. The complaint subsequently filed by Jane and her children alleged that the defendant police officers also prevented neighbors from breaking down the door.

The complaint further alleged that Horka delayed outside the apartment, questioning Jane in an accusatory and rude manner, attempting to obtain a key from the landlord, and attempting to gain entry to the front door of the apartment by ringing the doorbell. The complaint alleged that Horka and another officer walked around the apartment building, checking Jane's windows and rear door, but they did not gain entry at those locations. Plaintiffs' complaint claimed the rear balcony

sliding glass doors, 12 feet above ground level, were unlocked and ajar, and that the rear door of the building and the back door to Jane's apartment were also unlocked.

According to the complaint, Officer Horka spoke by radio to his supervisor, Sergeant Targonski, who directed Horka to break down the door. Several paramedics arrived and told the officers that a "lock pick," a locksmith, and a ladder were available for gaining entry into the apartment. However, Officer Horka, and other officers at the scene, still did not attempt to gain entry into Jane's apartment. Finally, Investigator Miller of the Calumet City police department arrived at the scene, interviewed Jane, and, accompanied by several officers, entered the apartment through the rear door of the building and the back door of the apartment, which were unlocked. When the officers entered the apartment, they found Valentine raping Betty. From the time the officers arrived until Investigator Miller interceded, Valentine had repeatedly raped Betty and forced her to perform deviate sexual acts. Also during this time, Valentine had choked and threatened John. See *Doe*, 161 Ill. 2d at 381-83.

As this court noted in *Doe*, from those facts, "plaintiffs' complaint framed three theories for transferring the cost of their injuries to the defendant police officers and their respective municipalities. Betty and John brought a negligence count alleging the special duty exception to defendants' statutory immunity. In addition, the negligence count also alleged willful and wanton misconduct. Jane brought a count alleging intentional infliction of emotional distress." *Doe*, 161 Ill. 2d at 383-84. Pertinent to our present inquiry, the circuit court granted defendants' motion to dismiss the negligence and willful and wanton misconduct counts for failure to state a claim upon which relief could be granted. *Doe*, 161 Ill. 2d at 380.

This court agreed that the negligence count was properly dismissed because plaintiffs had not established all of the necessary elements for application of the special duty doctrine. *Doe*, 161 Ill. 2d at 387. In the course of that portion of the court's analysis, this court engaged in a cursory discussion of sections 4–102 and 4–107 of the Tort Immunity Act (Ill. Rev. Stat. 1987, ch. 85, pars. 4–102, 4–107), and thereafter

concluded that "[a]n exception to both the common law public duty rule and the statutory immunities has evolved where the actions of the municipality's agent showed a special relationship with the plaintiff that created a duty different from the duty owed to the general public." *Doe*, 161 Ill. 2d at 385-86. This court, in *Doe*, thus held that the "special duty doctrine," a judicially created exception to the judicially created public duty rule, could be used to override *both* the public duty rule and any applicable statutory immunities.

To the extent that *Doe* held the special duty doctrine could override statutory immunities, that portion of the decision was overruled by this court, *sub silentio*, in *Zimmerman*. *Zimmerman*, 183 Ill. 2d at 46-50 ("Because the special duty doctrine is a judicially created exception to the public duty rule, the special duty doctrine cannot, and was not intended to, contravene the immunities provided to governmental entities under the Tort Immunity Act. Such operation constitutes a violation of the Illinois Constitution's provisions governing sovereign immunity (Ill. Const. 1970, art. XIII, §4) as well as the separation of powers (Ill. Const. 1970, art. II, §1)").

This court in *Doe* also held that the allegations of willful and wanton misconduct in plaintiffs' complaint stated a cognizable claim against *one* of the police officers involved, Officer Horka, pursuant to section 2–202 of the Tort Immunity Act. *Doe*, 161 Ill. 2d at 388-90. Section 2–202 of the Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2–202 (West 2002). This court's decision in *Doe* suggests–without ever stating–that Officer Horka, the supervising officer in control of the crime scene, was engaged in the "execution or enforcement" of the law for purposes of section 2–202. In concluding that "plaintiffs' complaint presented a jury question as to whether Officer Horka's conduct was willful and wanton," this court emphasized the following:

> "The complaint repeatedly states that Officer Horka was the officer in control at the scene. Plaintiffs' complaint alleges that Officer Horka was aware of the facts

surrounding the intrusion into plaintiffs' home, including the assault of Jane and the presence of the intruder in the plaintiffs' home with Betty and John. *** A rational trier of fact could find that Officer Horka's conduct showed an 'utter indifference or conscious disregard for the safety of' Betty and John." *Doe*, 161 Ill. 2d at 390-91.

However, this court held that "[t]he allegations in the complaint [were] insufficient to create a jury question regarding the willful and wanton nature of the conduct of" other officers named in the complaint, who had also responded to scene and were also aware of the facts surrounding the ongoing criminal action. *Doe*, 161 Ill. 2d at 391. This court found the distinguishing factor to be the control that Horka exercised over the crime scene and over other officers who responded to the scene. *Doe*, 161 Ill. 2d at 390-91. See also *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 323 (1995) (acknowledging the significance of the element of control in *Doe*: "This officer [Horka] physically restrained the mother and neighbors from trying to break in to save the minor girl, who was being repeatedly raped by the assailant, and the young boy, who was being choked and threatened").

What emerges from this court's decision in *Doe* is a fact-specific application of section 2–202 that bears some striking similarities to an application of the special duty exception to the public duty rule. The special duty exception to the public duty rule requires that (1) the municipality must be uniquely aware of the particular danger or risk to which plaintiff is exposed; (2) there must be specific acts or omissions on the part of the municipality; (3) the specific acts must be affirmative or willful in nature; and (4) the injury must occur while the plaintiff is under the direct and immediate control of municipal employees or agents. *Doe*, 161 Ill. 2d at 386. Although this court found that "the police did not owe plaintiffs a special duty different from the duty owed the general public" because plaintiffs' complaint did "not allege sufficient facts to show that Betty and John were under the direct and immediate control of defendants" (*Doe*, 161 Ill. 2d at 387), the court held that Officer Horka's control of the *crime scene* was sufficient, considering

all the attendant circumstances, to allege a cause of action based upon willful and wanton misconduct under section 2–202. We note that Horka not only exercised control over the crime scene, but also, according to the complaint, stopped others from entering the apartment to rescue the children.

Our review of *Doe*'s application of section 2–202 reveals three elements of importance which distinguish *Doe* from the case now before us.. First, and most obvious, in *Doe,* Officer Horka actually responded to the scene and, second, he was, at least ostensibly, engaged in "the execution or enforcement" of the law when he assumed a supervisory role over the investigation and law enforcement activities at the scene. As plaintiff acknowledges, the police in this case did not respond at all. Even if they had, they would have been providing service in the nature of a community caretaking function, not "enforcing or executing" the law, as this court has heretofore interpreted that phrase. As we stated in *Aikens*, "Section 4–102 immunity may apply in the context where police officers are simply 'providing [or failing to provide] police services,' but section 2–202 immunity requires more particular circumstances for its application, *i.e.*, an act or a course of conduct 'in the execution or enforcement' of law." *Aikens*, 145 Ill. 2d at 282. The policy considerations that support the "common law blanket immunity, codified in section 4–102," are "different policy considerations" from those underlying section 2–202 of the Act. *Aikens*, 145 Ill. 2d at 282-83. The third element of importance in *Doe*–the assertion of control at the scene–may help to explain why there are different policy considerations underlying the two immunity provisions. When an officer does respond to a call, be it a report of a crime in progress, as in *Doe*, or a multivehicle traffic accident requiring "enforcement of the traffic laws," as in *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211 (1986), he or she exercises a degree of control over the situation and may well alter the circumstances at the scene for better–or worse. The legislature obviously intended to immunize an officer from his negligence in that circumstance, but section 2–202 expresses a policy determination that the officer should not be afforded immunity for acts of willful and wanton misconduct. Where no officers respond to the scene–whether it is because no police

protection services are provided or because the services provided prove to be inadequate–the status quo ante is at least not altered to the detriment of those present. We believe that to be the reasoning behind the legislature's enactment of section 4–102 of the Tort Immunity Act.

In sum, we hold that the plain language of section 4–102 of the Tort Immunity Act immunizes defendants under the facts of this case. Section 2–202 does not apply in this instance as an exception to section 4–102 immunity because defendants were not executing or enforcing the law and they did not exercise control over Hays. Although we recognize that there may be additional exceptions to the application of section 4–102 where a legislative enactment identifies a specially protected class of individuals to whom statutorily mandated duties are owed (see *Moore v. Green*, No. 100029, slip op. at 29-35 (April 20, 2006); *Calloway*, 168 Ill. 2d at 323-24 (discussing the statutorily mandated duties owed to the class of individuals protected by the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2002))), we do not encounter such a scenario here. Although we firmly believe that citizens have a right to expect the police to respond in a situation like this, the issue here is whether section 4–102 of the Tort Immunity Act immunizes the defendants from liability and the consequent payment of public funds in satisfaction of an individual's damage claims. See *Village of Bloomingdale*, 196 Ill. 2d at 490 (" 'By providing immunity, the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims.' "), quoting *Bubb*, 167 Ill. 2d at 378. Section 4–102 immunity applies in this case.

For the foregoing reasons, we affirm the judgment of the appellate court.

*Affirmed.*


JUSTICE McMORROW, dissenting:

At issue in this appeal is whether defendants in this action–various counties and municipalities, as well as their agents and employees–under the facts presented, are

*absolutely immune* from liability based upon section 4–102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/4–102 (West 2002)). The majority answers this question in the affirmative, holding that a complaint alleging either negligence or willful and wanton misconduct on the part of defendants is properly dismissed pursuant to this statutory provision.

Pertinent to the instant cause, section 4–102 of the Tort Immunity Act provides:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service ***." 745 ILCS 10/4–102 (West 2002).

The majority affirms the circuit court's dismissal of plaintiff's complaint on the basis that defendants are completely immunized from plaintiff's claims pursuant to section 4–102 of the Tort Immunity Act (745 ILCS 10/4–102 (West 2002)). The majority arrives at this conclusion based on a rationale first employed by this court in *Barnett v. Zion Park District*, 171 Ill. 2d 378 (1996). In *Barnett*, this court held that section 3–108(a) of the Tort Immunity Act (745 ILCS 10/3–108(a) (West 1992)) cloaked the defendant park district with absolute immunity against allegations that lifeguards at the defendant's swimming pool knowingly and willfully ignored pleas to save a drowning minor, thereby causing the minor's death. The *Barnett* majority reasoned that the absence of an explicit exception for willful and wanton misconduct in section 3–108(a) of the Act meant that "the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct." *Barnett*, 171 Ill. 2d at 391-92. In the course of my dissent from the majority's holding in *Barnett*, I observed that there "are strong reasons why the policies underlying grants of immunity for simple negligence should not be impliedly expanded to reach willful and wanton or intentional misconduct." *Barnett*, 171 Ill. 2d at 403 (McMorrow, J., dissenting).

More specifically, I explained in *Barnett* that "the general rationale for granting public entities the protection of immunities

not enjoyed by private entities is the significant expense and burdens placed upon the government" when negligence on the part of local public entities or officials carrying out their government duties results in injuries to the public and such negligence lawsuits "are permitted to flourish unchecked." *Barnett*, 171 Ill. 2d at 403-04 (McMorrow, J., dissenting). It was my view, however, that the "rationale underlying a grant of immunity for simple negligence is different in kind from any justification for immunizing tortious conduct that is intentionally harmful or willful and wanton," and if the legislature actually intended to bestow absolute immunity for willful and wanton misconduct, the immunity statute should positively and unequivocally state such an intention. *Barnett*, 171 Ill. 2d at 404 (McMorrow, J., dissenting).

Since *Barnett*, I have adhered to my belief that the policies underlying grants of immunity for simple negligence are distinguishable from any justification for blanketing deliberate governmental misconduct with immunity. See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 213-14 (1997) (McMorrow, J., concurring in part and dissenting in part); *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 354 (1998) (McMorrow, J., concurring in part and dissenting in part); *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 401-02 (1998) (McMorrow, J., dissenting); *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 501-10 (2001) (McMorrow, J., concurring in part and dissenting in part); *Arteman v. Clinton Community Unit School District No. 15*, 198 Ill. 2d 475, 488-90 (2002) (McMorrow, J., concurring in part and dissenting in part); *Moore v. Green*, No. 100029, slip op. at 15-20 (April 20, 2006) (McMorrow, J., specially concurring). I note that my conclusion in *Barnett* that the legislature did not intend to immunize willful and wanton misconduct in the immunity provisions of section 3–108 was validated when the General Assembly passed Public Act 90–805 (Pub. Act 90–805, eff. December 2, 1998), which amended section 3–108 to exclude willful and wanton conduct from the immunity granted by the statute. My conviction remains unwaivering that deliberate acts of governmental misconduct are not protected under the Tort Immunity Act by provisions which remain silent with respect to

˘23˘

an express exemption for such intentional harmful acts.

In the matter at bar, the majority, based upon the *Barnett* rationale, interprets section 4–102 of the Tort Immunity Act (745 ILCS 10/4–102 (West 2002)) as affording a local governmental entity and its employees absolute immunity against liability for *any* injury caused to a citizen as a result of the entity's "failure to establish a police department or otherwise provide police protection service or if police protection service is provided, for failure to provide adequate police protection or service," even if such injury results from intentional and knowing misconduct on the part of defendants. The majority arrives at this result on the basis that section 4–102 does not contain an express exemption for willful and wanton misconduct. The majority, however, does recognize that there may be limited exceptions to the application of the blanket immunity it finds exists in section 4–102 in those instances "where a legislative enactment identifies a specially protected class of individuals to whom statutorily mandated duties are owed." Slip op. at 19. This limited exception, however, does not ameliorate the harshness of the majority's holding which will, in most instances, insulate government entities and employees from liability for intentional misconduct.

The majority states that although it "firmly believe[s] that citizens have a right to expect the police to respond in a situation like this, the issue here is whether section 4–102 of the Tort Immunity Act immunizes the defendants from liability and the consequent payment of public funds in satisfaction of an individual's damage claims." Slip op. at 19. It is my view that blanket immunity should not be afforded to acts performed by local governmental entities or government officials in bad faith, especially where the provision of life-and-death police protection services are at issue. It is evident to me that the blanket, unlimited immunity bestowed upon defendants in this case is unnecessary to protect public entities from liability arising from "the operation of government," which is the stated purpose of the Tort Immunity Act (745 ILCS 10/1–101.1 (West 2002)). Construing section 4–102 of the Act to immunize only negligent conduct would completely fulfill this legislative objective.

Accordingly, I respectfully dissent from the majority's conclusion that intentional misconduct by a local public entity or employee is shielded by the provisions contained within section 4–102 of the Tort Immunity Act (745 ILCS 10/4–102 (West 2002)). I continue to adhere to the view that where the Tort Immunity Act is silent on the question of whether intentional government misconduct is exempt from immunity, it should not be concluded that such silence translates into a positive intent on the part of the General Assembly to cloak local governmental entities and their employees with unconditional immunity.