FIRST DIVISION

No. 1-08-1653

| | | |
|---|---|---|
| REBECCA HESS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD FLORES, Individually and d/b/a | ) | |
| Flores Properties Inc., CHARLOTTE K. | ) | |
| FLORES, a/k/a Charlotte K. Klink, | ) | No. 04 L 12005 |
| | ) | |
| Defendants | ) | |
| | ) | |
| (The City of Chicago, | ) | Honorable |
| | ) | Elizabeth Budzinski, |
| Defendant-Appellee). | ) | Judge Presiding. |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Hall and Justice Hoffman concur with the judgment and opinion.

**OPINION**

Plaintiff, Rebecca Hess, fell from the second-floor, rear staircase of an apartment building located at 2050-2052 W. Summerdale Avenue, Chicago (the Summerdale building). Plaintiff fell where a portion of the rear staircase handrail had been removed and marked with yellow caution tape. Prior to her fall, the rear staircases and porches had been the subject of multiple inspections by the city of Chicago (the City) and judicial proceedings relating to building code violations.

Plaintiff brought this action seeking damages against defendants, Ronald Flores, individually and d/b/a Flores Properties Inc., and Charlotte K. Flores, a/k/a Charlotte K. Klink, as owners and/or managers of the Summerdale building for failing to maintain and repair the rear stairs and porches. Plaintiff also sued the City for allegedly wilful and wanton conduct on the part of its building

inspectors. Plaintiff now appeals from an order granting the City's motion for summary judgment, an order made final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010).

## I. BACKGROUND

Plaintiff filed her initial complaint on October 24, 2005. The operative first-amended complaint was filed in January of 2006.

In the amended complaint, plaintiff generally alleged that the Summerdale building was a three-story building which defendants Mr. Flores and Ms. Klink leased for residential purposes. The building included a rear porch and staircase system for use by lessees and invitees of the property. On a number of occasions in 2002 and 2003, the Summerdale building had been inspected by the City for violations of the municipal building code (Code), including defects in the construction of the rear porch and staircase system. A March 15, 2002, inspection report noted that the "outer stringer" was scabbed at the second-floor deck, a four-inch by four-inch upright was rotting at the second-floor deck, and there was a pulling railing section from the second to the third floor. After two subsequent inspections continued to find the porch and staircase system to be in a dangerous condition, the City filed a formal housing court complaint against Mr. Flores. The complaint alleged 11 violations of the Code, including a failure to replace a "dilapidated and dangerous porch."

The City continued to inspect the Summerdale building in 2003 and 2004, and continued to find the porch and staircase system to be in a "dangerous and hazardous condition." While Mr. Flores and Ms. Klink did undertake some repairs of this system, they did so without a building permit, and at the time of plaintiff's accident, the porch and staircase system did not have any "side railings and/or

hand railings on the rear staircase." On August 18, 2004, plaintiff fell from the rear porch system while exiting an apartment on the second floor of the Summerdale building. She suffered severe injuries, including a spinal cord injury resulting in paralysis.

Plaintiff's amended complaint contains allegations of negligence and willful and wanton conduct against both Mr. Flores and Ms. Klink. The complaint also contains a single count of "willful and wanton" conduct against the City. Specifically, plaintiff alleged that the City owed her a duty "to refrain from or engage in, both directly and indirectly, acts and/or omissions exhibiting reckless disregard and utter indifference in the inspection of buildings and execution and enforcement of the law." Plaintiff alleged that the City, through it's department of buildings, breached this duty when it acted with utter indifference or conscious disregard for the safety of others by: (1) failing to adequately and properly inspect the porch and staircase system for Code violations; (2) failing to train the building inspectors to identify Code violations; (3) engaging in a practice of hiring unqualified building inspectors; (4) failing to block access to or remove the rear staircase's hazardous conditions; (5) allowing the Summerdale building to remain in a hazardous condition; (6) failing to fully inform the housing court judge of the hazardous condition of the rear staircases; and (7) requiring Mr. Flores to place yellow caution tape on the porch in place of the handrails or side rails.

In deposition testimony, Vladimir Tkach, a building inspector for the City's department of buildings, bureau of conservation, confirmed that he inspected the Summerdale building on March 15, 2002. He discovered 17 violations of the Code throughout the Summerdale building, including certain problems with the rear porches and stairs. Although the department of buildings referred the Code violations to administrative hearing, the rear porches and stairs remained in disrepair when Mr.

Tkach inspected the Summerdale building on October 9, 2002, and July 17, 2003. After his July 17, 2003, inspection, Mr. Tkach concluded that the rear staircases were "dangerous and hazardous." The department of buildings recommended that suit be brought in housing court against the owners for violations of the Code.

For purposes of reporting to the housing court judge on the status of any repairs, Mr. Tkach also inspected the Summerdale building on October 24, 2003, January 6, 2004, and February 18, 2004. Although repairs had begun, he concluded on each of these dates that the rear staircases were still in a dangerous and hazardous condition. Mr. Tkach believed that the rear staircases and porches needed to be replaced or assessed by an engineer. Mr. Tkach denied that he ever ordered the porch repairs to stop or told anyone to take down the handrails and put up yellow caution tape.

After Mr. Tkach was transferred to another position, Donald Lesley had responsibility for inspecting the Summerdale property for the housing court case. Mr. Lesley testified in his deposition that he inspected the building on June 9, 2004, and found that the rear porches and stairs were still in a dangerous and hazardous condition. Mr. Lesley observed that the repair work to the staircases was creating unsafe conditions and was not in compliance with the Code. On June 9, 2004, Mr. Lesley asked the worker to tell the owners that the repairs were not being done in a workmanlike manner and "to get it together." Mr. Lesley also denied that he ever ordered the porch repairs to stop and denied telling anyone to take down the handrails and put up yellow caution tape.

John Price, a former supervisor for the bureau of conservation, retired in March 2004. In his deposition, Mr. Price explained that bureau of conservation inspectors may ask owners to stop work but are not authorized to issue stop-work orders. Mr. Price agreed that open stair railings with

yellow caution tape would be in violation of the Code and a dangerous condition.

Mr. Flores testified that he hired Russell Roe, a tenant in the Summerdale building, to complete the repairs on the rear porches. Mr. Flores also testified that while those repairs were taking place, a City inspector told either himself or Mr. Roe to stop the repair work on the porches and stairs because no permit had been obtained for that work. Mr. Flores told Mr. Roe to put up yellow caution tape if he was working on the porches. At the time work was stopped by the City, a portion of the handrails had been removed.

Mr. Roe testified that, before beginning work in June or July of 2004, he met with an unnamed building inspector to discuss the Code violations and the necessary repairs of the rear staircases. Mr. Roe began to remove sections of the handrails at the end of July or beginning of August. Mr. Roe testified that, after some of the handrails were removed, the same building inspector who met with him prior to the repairs ordered that the work on the rear staircases stop because no permit had been issued. Mr. Roe stated that the City inspector threatened him with arrest should the work continue, and also told him to put up yellow caution tape to warn the tenants to stay off.

On the day he was told to stop work on the staircases, Mr. Roe put yellow caution tape across the rear doors of the apartments and other points of access and through the handrails and other places on the staircases. He also gave written warnings to the tenants that the staircases should not be used. Mr. Roe testified that two female City inspectors later came to the Summerdale building and reiterated that no work should be done on the rear staircases. One of these inspectors remarked to Mr. Roe: "Oh, good. I see you guys got the tape up." Mr. Roe said these inspectors saw that handrails were missing and that the stairs were marked with yellow caution tape.

No. 1-08-1653

In moving for summary judgment, the City argued that, under the common law public duty rule, it did not owe plaintiff a duty. Moreover, even if a duty existed, the City was protected from liability under certain provisions of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1–101 *et seq*. (West 2008)), including sections 2–105 and 2–207, which specifically relate to inspections of private property (745 ILCS 10/2–105, 2–207 (West 2008)). Plaintiff responded by arguing that a duty existed. Additionally, plaintiff asserted that any immunity provisions were not applicable because the City had contributed to the dangerous condition of the rear staircase by ordering the repair work to stop at a time when there were missing handrails, directing that yellow caution tape be placed along the openings, and threatening Mr. Roe with arrest if he continued to work on the rear staircases. The trial court granted the City's motion for summary judgment, and subsequently made that order final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Jan. 1, 2006).

## II. ANALYSIS

On appeal, plaintiff asserts that the City's motion for summary judgment was improperly granted because the City did in fact owe her a duty and the Tort Immunity Act did not provide immunity for the City's breach of that duty. Because the issues of governmental duty and immunity have been the source of a great deal of prior litigation, we begin with a review of both legal concepts before addressing plaintiff's specific arguments.

### A. Standard of Review

"Summary judgment is proper if, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010); 735 ILCS 5/2–1005(c) (West 2008). The propriety of an order granting summary judgment is a question that we review *de novo*. *Jones v. Country Mutual Insurance Co.,* 371 Ill. App. 3d 1096, 1098 (2007). "Furthermore, we may affirm the trial court's grant of summary judgment for any reason that is supported by the record, regardless of whether that reason formed the basis for the trial court's judgment." *Bovan v. American Family Life Insurance Co.*, 386 Ill. App. 3d 933, 938 (2008).

As noted above, the issues raised in this appeal include the existence, if any, of a duty on the part of the City and whether the City is nevertheless immune from suit pursuant to the Tort Immunity Act. Both of these are questions of law and, therefore, are also subject to our *de novo* review. *Vancura v. Katris*, 238 Ill. 2d 352, 373-74 (2010) (whether a duty exists is a question of law, which is reviewed *de novo*); *Wilson v. City of Decatur*, 389 Ill. App. 3d 555, 558 (2009) (interpretation of the Tort Immunity Act is a matter of law reviewed *de novo*).

## B. Historical Duties and Immunities

Under the common law, to prevail in a tort action a plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that plaintiff incurred injuries proximately caused by the breach. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). The requirement that a plaintiff establish the existence of a duty of care applies whether the plaintiff proceeds under a theory of negligence or willful and wanton conduct. *Bialek v. Moraine Valley Community College School District 524*, 267 Ill. App. 3d 857, 862 (1994). Where there is no duty, there can be no liability. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 447 (1996).

No. 1-08-1653

However, historically the common law specifically protected local governmental entities from tort liability under the doctrine of sovereign immunity and the public duty rule. The sovereign immunity doctrine traditionally immunized a governmental unit in Illinois from liability and has been called a " 'survival of the medieval idea that the sovereign can do no wrong,' or that 'the King can do no wrong.' " *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 20 (1959) (quoting 38 Am. Jur., *Municipal Corporations*, § 573, at 266). Under the public duty rule, a municipality is not to be held liable for its failure to provide adequate governmental services, such as police or fire protection. *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968). "The rationale for this rule was that the duty of a municipality to provide governmental services was owed to the public at large and therefore took precedence over any duty owed to a particular plaintiff." *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345 (1998).

A common law exception to the public duty was recognized, however, where a governmental unit was operating under a "special duty" to a particular individual such that it could be held liable in tort. *Huey*, 41 Ill. 2d at 363. For there to be a special duty, four requirements must be met: (1) the governmental entity must be uniquely aware of the particular danger or risk to which plaintiff is exposed; (2) plaintiff must show specific acts or omissions on the part of the entity; (3) those specific acts or omissions must be affirmative or willful in nature; and (4) the injury must occur while plaintiff is under the direct and immediate control of employees or agents of the governmental entity. *Thames v. Board of Education*, 269 Ill. App. 3d 210, 214 (1994).

However, this common law structure has been significantly altered, beginning in 1959 with our supreme court's abolishment of sovereign immunity in *Molitor*. *Molitor*, 18 Ill. 2d at 20. In

-8-

response to the *Molitor* decision, the legislature passed the Tort Immunity Act in 1965. Ill. Rev. Stat. 1965, ch. 85, par. 1–101 *et seq*. (now 745 ILCS 10/1-101 *et seq*. (West 2008)). The Tort Immunity Act adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions. *Harinek*, 181 Ill. 2d at 344. "By providing immunity, the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims." *Bubb v. Springfield School District 186*, 167 Ill. 2d 372, 378 (1995).

The next major change occurred in 1970, when:

"The ratification of the Illinois Constitution of 1970 validated both *Molitor* and the Tort Immunity Act. Article XIII, section 4, of the Illinois Constitution reads as follows: 'Except as the General Assembly may provide by law, sovereign immunity in this State is abolished.' [Citation.] This provision embodies the presumptive rule from *Molitor* that units of local government are subject to tort liability, but 'makes the General Assembly the ultimate authority' in determining whether such a unit is nevertheless immune from liability. [Citation.] Therefore, governmental units are now liable in tort on the same basis as private tortfeasors unless a valid statute dealing with tort immunity imposes conditions upon that liability. [Citation.] Where such statutory conditions are found to exist, tort liability is precluded." *Harinek*, 181 Ill. 2d at 344-45.

Thus, with the passage of the Tort Immunity Act and the ratification of the 1970 Illinois Constitution, we may refer to the common law to determine the duties of a local governmental entity.

*Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001). However, "to determine whether that entity is liable for the breach of a duty, we look to the Tort Immunity Act, not the common law." *Bloomingdale*, 196 Ill. 2d at 490.

C. Open Questions Addressed in the Case Law

Despite these efforts to codify the nature and scope of governmental liability and immunity, courts have continued to struggle with these concepts for decades. Of particular relevance to this appeal, much of this litigation has centered around four related issues: (1) did the public duty rule survive the adoption of the Tort Immunity Act and the ratification of the 1970 Illinois Constitution; (2) if so, is the special duty exception to the public duty rule still relevant in light of the legislature's sole constitutional authority to determine governmental immunity; (3) do the various provisions of the Tort Immunity Act immunize governmental units for their willful and wanton conduct; and (4) if a specific Tort Immunity Act provision does provide immunity for willful and wanton conduct in a specific context, does section 2–202 of the Tort Immunity Act (745 ILCS 10/2–202 (West 2008)), which explicitly exempts willful and wanton conduct from municipal employee immunity for acts or omissions in the execution or enforcement of any law, also apply and/or operate as an exception to any such broader immunity? A review of how the courts have addressed these questions will allow us to properly resolve this appeal.

We first consider the public duty rule. It might seem an anachronism that this rule should have survived the adoption of the Tort Immunity Act and the ratification of the 1970 Illinois Constitution. As our supreme court has repeatedly stated, given the language of the Illinois Constitution and the Tort Immunity Act, governmental units are to be held liable in tort on the same

basis as any private tortfeasor unless a tort immunity statute imposes conditions upon that liability. *Bloomingdale*, 196 Ill. 2d at 490; *Harinek*, 181 Ill. 2d at 345; *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386 (1996). It is therefore reasonable to question the continuing relevance of a common law rule limiting the liability of governmental units, especially one that seems to be founded in the abolished doctrine of sovereign immunity. Indeed, at least one supreme court justice has recognized such concerns, contending that the public duty rule was based upon concepts of sovereign immunity and, therefore, is no longer viable in this state. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 337-43 (1995) (Freeman, J., concurring). More recently, our supreme court specifically addressed questions about the continued validity and scope of the common law public duty rule in *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 506-09 (2006). However, the court did not decide the issue of duty in that case, instead resolving the appeal on the basis of a statutory immunity. *DeSmet*, 219 Ill. 2d at 509.

Nevertheless, in the absence of a decision from our supreme court to the contrary, it remains clear that the public duty rule continues to play a role in the determination of governmental tort liability. Specifically, the court has recognized that "the existence of a duty and the existence of an immunity are separate issues." *Barnett*, 171 Ill. 2d at 388. Furthermore, " '[u]nlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was any enforceable duty to the plaintiff in the first place.' " *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 46 (1998) (quoting 18 Eugene McQuillin, The Law of Municipal Corporations §53.04.25, at 165 (James Perkowitz Solheim, *et al*. eds. 3d rev. ed. 1993)). Thus, because the Tort Immunity Act codifies immunities and does address preexisting common law duties, "neither [the supreme court's] decision in *Molitor* abolishing sovereign immunity,

the General Assembly's passage of the Tort Immunity Act, nor the ratification of the 1970 Illinois Constitution altered the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." *Id*. at 45-46.

While the public duty rule's common law foundation may remain sound, the special duty exception to that rule has been significantly affected by the passage of the Tort Immunity Act and the ratification of the 1970 Illinois Constitution. As explained above, the "special duty doctrine arose as a judicially created exception to the nonliability principles of the public duty rule, and is applicable in certain limited instances where a governmental entity has assumed a special relationship to an individual 'so as to elevate that person's status to something more than just being a member of the public.' " *Zimmerman*, 183 Ill.2d at 32-33 (citing *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987)). Thus, the special duty exception is a common law, judicially created rule which both establishes a duty on the part of a governmental entity *and* imposes liability for a breach of that duty. In light of the passage of the Tort Immunity Act and the ratification of the 1970 Illinois Constitution, however, we now look to the Tort Immunity Act and not the common law to determine whether a governmental entity is liable for the breach of a duty. *Bloomingdale*, 196 Ill. 2d at 490. What then is the role of the special duty exception to the public duty rule, both in terms of governmental duty and liability, in this altered statutory and constitutional landscape?

Our supreme court has in the past recognized that, despite the language of the 1970 Illinois Constitution granting the legislature the power to define governmental immunities, the special duty exception could override both the common law public duty rule and any immunities provided by the Tort Immunity Act. See *Doe v. Calumet City*, 161 Ill. 2d 374, 385-86 (1994) ("An exception to both

the common law public duty rule and the statutory immunities has evolved where the actions of the municipality's agent showed a special relationship with the plaintiff that created a duty different from the duty owed to the general public.") However, that position has since been reversed.

In *Harinek*, our supreme court determined that "the special duty doctrine may not operate to impose liability upon a public entity after a court has found that entity immune from liability under the Tort Immunity Act." *Harinek*, 181 Ill. 2d at 347. The court reasoned that any other conclusion would violate the Illinois Constitution's provisions concerning both sovereign immunity and those regarding the separation of powers. *Id*. The supreme court subsequently reaffirmed this position in *Zimmerman*: "Because the special duty doctrine is a judicially created exception to the public duty rule, the special duty doctrine cannot, and was not intended to, contravene the immunities provided to governmental entities under the Tort Immunity Act." *Zimmerman*, 183 Ill. 2d at 46. Thus, the current position of our supreme court is that the "special duty doctrine simply allows courts to impose liability upon a municipality by making an exception to the public duty rule in cases in which the legislature has not granted immunity to the municipality." *Harinek*, 181 Ill. 2d at 347.

Another question that has been addressed by the courts of this state is whether many of the numerous individual provisions of the Tort Immunity Act protect a governmental unit from suits seeking to recover for willful and wanton conduct, or only those alleging negligence. Even a cursory review of the Tort Immunity Act will reveal numerous provisions providing governmental entities or their employees with specific immunities but which do not specifically address the issue of whether those immunities extend to allegations of willful and wanton conduct. This includes two of the provisions at issue in this case. See 745 ILCS 10/2–105, 2–207 (West 2008). Nevertheless, our

supreme court has almost universally held that such provisions also immunize governmental entities and employees for willful and wanton conduct.

For example, in *Barnett* a park district claimed immunity from a suit alleging willful and wanton conduct with regard to the drowning of a child in the district's swimming pool. *Barnett*, 171 Ill. 2d at 389. The district specifically claimed it was immune pursuant to section 3–108 of the Tort Immunity Act, which as the supreme court recognized does not specifically include any language regarding willful and wanton conduct. *Barnett*, 171 Ill. 2d at 388 (quoting 745 ILCS 10/3–108 (West 1992)). Nevertheless, the supreme court rejected the argument that section 3–108 did not provide full immunity, stating:

> "The plain language of section 3–108 is unambiguous. That provision does not contain an immunity exception for willful and wanton misconduct. Where the legislature has chosen to limit an immunity to cover only negligence, it has unambiguously done so. [Citation.] Since the legislature omitted such a limitation from the plain language of section 3–108, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct. [Citations.]" *Barnett*, 171 Ill. 2d at 391-92.

Our supreme court has used similar reasoning in other cases, finding that the Tort Immunity Act provides blanket immunity despite the lack of any specific reference to willful and wanton conduct. See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 196 (1997) (section 2–201); *Harinek*, 181 Ill. 2d at 347 (section 2–201); *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394-95 (1998) (section 3–108). This court has in turn relied upon these decisions to determine that at least

two of the immunity provisions at issue here, sections 2–105 and 2–207 of the Tort Immunity Act, also provide blanket immunity to governmental units. *Ware v. City of Chicago*, 375 Ill. App. 3d 574, 583 (2007).

There is, however, at least one instance where our supreme court has not been consistent in its treatment of the Tort Immunity Act immunities. In *Doe*, the court addressed the final issue highlighted above, *i.e.*, does section 2–202 of the Tort Immunity Act operate as an exception to the blanket immunities provided in other sections? *Doe*, 161 Ill. 2d at 388. The court considered this question in the context of allegations of negligence and willful and wanton conduct asserted against Calumet City and several of its police officers with respect to a response to an emergency 911 call. *Doe*, 161 Ill. 2d at 381-84. Defendants asserted that they were immune from suit pursuant to sections 4–102 and 4–107 of the Tort Immunity Act, which respectively immunize governmental entities and their employees for actions in the provision of police services and failures to arrest or maintain custody over an individual. *Doe*, 161 Ill. 2d at 385 (citing Ill. Rev. Stat.1987, ch. 85, pars. 4–102, 4–107. However, the court noted that the Tort Immunity Act also contained a provision, section 2–202, which provided that a " 'public employee is not liable for his act or omission in the execution or enforcement of any law *unless such act or omission constitutes willful and wanton conduct*.' " (Emphasis in original.) *Doe*, 161 Ill. 2d at 388 (quoting Ill. Rev. Stat. 1987, ch. 85, par. 2–202).

In light of these various provisions, the court determined that it must consider whether section 2–202 operated as an exception to the blanket immunity provided by sections 4–102 and 4–107 of the Tort Immunity Act. *Doe*, 161 Ill. 2d at 388-89. The court noted that prior decisions of the appellate court had come to differing conclusions, with some finding that sections 4–102 and 4–107

prevailed over section 2–202 and thus provided complete immunity, while others found that section 2–202 provided an exception to this immunity and allowed recovery against governmental entities for willful and wanton conduct. *Id*. at 389. Ultimately, the court sided with the latter line of authority and held that plaintiffs could evade the statutory immunities provided to governmental entities and their employees by establishing willful and wanton conduct. *Id.* at 390.

Not surprisingly, *Doe* generated a great deal of litigation and resulted in a host of decisions wrestling with exactly how to apply this holding. For example, some cases found that the *Doe* decision not only limited statutory immunities, but prevailed over the public duty rule to create a *duty* on the part of a governmental entity not to engage in willful and wanton conduct. See*, e.g., Ozik v. Gramins*, 345 Ill. App. 3d 502, 515 (2003); *Fatigato v. Village of Olympia Fields*, 281 Ill. App. 3d 347, 356-57 (1996). Our supreme court attempted to address some of these issues by interpreting the *Doe* decision as a very fact-specific application of section 2–202 to section 4–102 in *DeSmet*. *DeSmet*, 219 Ill. 2d at 519-20. Nevertheless, subsequent appellate court decisions have continued to grapple with exactly how the *Doe* decision should either be applied or distinguished. See *Anthony v. City of Chicago*, 382 Ill. App. 3d 983 (2008); *Bowler v. City of Chicago*, 376 Ill. App. 3d 208 (2007); *Ware*, 375 Ill. App. 3d at 574.

Indeed, but for a very recent decision of our supreme court, we would be forced to undertake a similar analysis in this case. However, our supreme court has recently brought significant and much-needed clarity to these issues in *Ries v. City of Chicago*, No. 109541 (Ill. Feb. 25, 2011), *pet. for reh'g pending*.

In *Ries*, a city of Chicago police officer placed Demario Lowe in the backseat of a squad

car–leaving him unsupervised–after Lowe had reportedly fled the scene of an accident. *Ries*, slip op. at 2. Lowe soon managed to gain control of the police car and drove off. Other police officers initiated a pursuit of Lowe, and Lowe ultimately collided with a vehicle occupied by the plaintiffs and injured them. *Id.* The plaintiffs sued the City alleging willful and wanton conduct and obtained a judgment against the City, and the City's motion for judgment notwithstanding the verdict was subsequently denied. The City appealed, and both this court and our supreme court agreed that the City's posttrial motion should have been granted pursuant to section 4–106(b) of the Tort Immunity Act. *Id.* at 1-2.

In reaching this decision, our supreme court first held that Lowe was an escaping prisoner and, therefore, the case properly implicated section 4–106(b) of the Tort Immunity Act. *Id.* at 8-10 (providing that neither a local public entity nor a public employee is liable for an injury inflicted by an escaped or escaping prisoner (citing 745 ILCS 10/4–106(b) (West 2008))). The court then noted that section 4–106(b) provides absolute immunity, and then rejected any argument that section 2–202, and its limit on immunity for willful and wanton conduct, prevailed over the blanket immunity provided by section 4–106(b). *Id.* The court found that "both section 2–202 and section 4–106(b) potentially apply to the facts of this case. However, section 4–106(b), the more specifically applicable immunity, controls." *Id.* at 12. The court reasoned:

> "Here, section 4–106(b) deals specifically with immunity for injuries inflicted
> by escaping prisoners, while section 2–202 is a general section applying to immunity
> for acts or omissions in the execution or enforcement of any law. Thus, even if we
> were to conclude that section 2–202 applies here, it could not prevail over section 4–

106(b), which applies more specifically and contains no exception for willful and wanton misconduct." *Id.* at 13.

However, not only did the supreme court specifically find that section 2–202 did not prevail over section 4–106(b), it also explicitly overruled its prior decision in *Doe* and found that section 2–202 does not provide a willful and wanton exception to *any* of the other sections of the Tort Immunity Act. *Id* at 13-18. The court noted that the *Doe* decision had been consistently called into question by subsequent decisions finding that statutory immunities extend to willful and wanton conduct unless the legislature *specifically* states otherwise. *Id.* In the end, the court stated that "[i]t is time for this court to acknowledge the obvious. Given that *Doe*'s legal underpinning has been consistently repudiated by this court, there is simply no longer any reason to try to either apply or distinguish that case. *** Because *Doe*'s holding that section 2–202 provides a general willful and wanton exception to the immunities otherwise provided by the Tort Immunity Act is no longer good law, we will not read a willful and wanton exception into section 4–106(b)." *Id.* at 18.

To summarize, the above review reveals a number of important principles relevant to this appeal. First, this state continues to recognize the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services. We also continue to recognize a special duty exception to the public duty rule, but this exception applies only in cases where the legislature has not provided a specific governmental immunity. Furthermore, statutory immunities provided by the Tort Immunity Act extend to allegations of willful and wanton conduct unless the legislature has specifically indicated otherwise. Finally, section 2–202 does not provide an exception to the immunities provided in other sections of the Tort Immunity Act and will

not prevail where other, more specific, immunities apply.

### D. The City's Motion for Summary Judgment Was Properly Granted

With the foregoing principles in mind, we can now properly address plaintiff's specific arguments. On appeal, plaintiff's brief presents several reasons why the trial court's award of summary judgment in favor of the City was improper. It must be noted, however, that the initial briefing in this case concluded before our supreme court's decision in *Ries*, and plaintiff therefore did not have the benefit of that decision in framing the issues on appeal. A simple comparison of the issues raised in plaintiff's brief and the *Ries* decision is enough to determine that many of the arguments are no longer viable. See *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 86 (1997) (when a court issues an opinion, the decision is generally presumed to apply both retroactively and prospectively).

Nevertheless, the City was granted leave to cite *Ries* as additional authority before this court, and the plaintiff has now had an opportunity to respond to *Ries* both in writing and at oral argument. While we therefore briefly summarize those arguments plaintiff has presented in the interest of clarity, we need only fully address those issues which, in light of *Ries* and the other case law cited above, are dispositive.

### 1. Duty

To begin with, plaintiff's brief asserts a number of reasons why the City did in fact owe her a duty. First, she asserts that the public duty rule is not applicable here because her assertions are not predicated on the City's failure to protect her generally, but on "its own affirmative actions in creating and exacerbating the dangerous condition" that caused her injuries. She also argues that, in any case,

the recognized exception to the public duty rule applies here because she adequately established the "control" element of the special duty doctrine. Plaintiff further contends that the *Doe* decision and its progeny specifically provide a cause of action against a governmental unit for actions that are, as alleged here, willful and wanton. Lastly, she argues that the City took control over the repairs at the Summerdale building and, therefore, it voluntarily assumed a duty to her to ensure that those repairs were properly completed.

To the extent that plaintiff asserts that the City had a duty to refrain from willful and wanton conduct, a duty that prevailed over the public duty rule and any statutory immunities, that argument cannot survive *Ries*. Our supreme court has now specifically overruled *Doe*, as well as those cases which interpreted *Doe* as supporting such a position. *Ries*, slip op. at 18 (overruling, for example, *Ozik*). Similarly, any assertion that the special duty exception would allow her to overcome both the public duty rule *and* any immunities provided by the Tort Immunity Act is unpersuasive in light of the decisions in *Harinek* and *Zimmerman*. *Harinek*, 181 Ill. 2d at 346-47; *Zimmerman,* 183 Ill. 2d at 46. Furthermore, we note that the public duty rule remains a viable and significant hurdle to any attempt to establish that the City owed plaintiff a duty here.

Plaintiff is therefore now limited to contending that the City owed her a duty because: (1) the public duty rule is somehow inapplicable to the alleged conduct here and the City was otherwise liable on the same basis as any private tortfeasor; (2) she has established the elements of the special duty exception to the public duty rule and no statutory immunity applies; or (3) the City voluntarily assumed a duty. Ultimately, we need not further consider these arguments.

As we explain below, we find that the Tort Immunity Act fully immunizes the City from

plaintiff's allegations. Any further discussion of the special duty exception is irrelevant, therefore, in light of our supreme court's determination that the exception simply does not apply when the legislature has granted an immunity. *Harinek*, 181 Ill. 2d at 347. Furthermore, any number of prior decisions have declined to fully address the issue of duty in this context, where the issue of immunity proves dispositive. See *DeSmet*, 219 Ill. 2d at 509; *Anthony*, 382 Ill. App. 3d at 988; *Bowler*, 376 Ill. App. 3d at 218. Because immunity is similarly dispositive here, we turn to the analysis of that issue.

### 2. Immunity

With respect to the issue of immunity, plaintiff's brief first asserts that neither of the specific Tort Immunity Act sections relied upon by the City (sections 2–105 and 2–207) extend to the affirmative willful and wanton conduct that forms the basis of her claim. Furthermore, she argues that the *Doe* decision establishes that section 2–202 must be read in connection with these other Tort Immunity Act sections, and section 2–202 specifically allows her to recover for the willful and wanton conduct alleged here. Finally, plaintiff contends that, under any circumstances, sections 2–105 and 2–207 are inapplicable here because the allegedly wrongful conduct was not part of the "inspection" process immunized therein. As above, a number of these arguments are no longer viable.

The purpose of the Tort Immunity Act is "to protect local public entities and public employees from liability resulting from the operation of government." *Ware*, 375 Ill. App. 3d at 577-78. When interpreting a provision of the Tort Immunity Act, "our primary goal is to ascertain and give effect to the intention of the legislature. We must seek the legislative intent primarily from the language used in the Tort Immunity Act." *Barnett*, 171 Ill. 2d at 388. When an immunity provision "is clear

No. 1-08-1653

and unambiguous, we are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *DeSmet*, 219 Ill. 2d at 510.

Section 2–105 of the Tort Immunity Act provides:

"A local public entity is not liable for injury caused by its failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property, other than its own, to determine whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." 745 ILCS 10/2–105 (West 2008).

Section 2–207 provides the same protections for employees of public entities, stating:

"A public employee is not liable for an injury caused by his failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property, other than that of the local public entity employing him, for the purpose of determining whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." 745 ILCS 10/2–207 (West 2008).

Obviously, neither of these sections contain language specifically addressing willful and wanton conduct. However, our supreme court has repeatedly held that where a statutory immunity provision unambiguously does not contain an exception for willful and wanton conduct, the courts should not read such an exception into the provision. *Ries*, slip op. at 8-10; *Barnett*, 171 Ill. 2d at 391-92; *In re Chicago Flood Litigation*, 176 Ill. 2d at 196; *Harinek*, 181 Ill. 2d at 347; *Henrich*, 186 Ill. 2d at 394-95. While our supreme court has not specifically addressed this question with respect

to the sections 2–105 and 2–207 of the Tort Immunity Act, this court has previously relied upon this reasoning to find that these sections also provide blanket immunity. *Ware*, 275 Ill. App. 3d at 583. In *Ries*, the supreme court cited *Ware* approvingly for this reasoning. *Ries*, slip op. at 12-13. We therefore see no reason to abandon *Ware*, and find that section 2–105 and 2–207 grant the City immunity for allegations of willful and wanton conduct.

Furthermore, plaintiff's argument that section 2–202 of the Tort Immunity Act limits this immunity is clearly no longer tenable. As *Ries* has now made clear, *Doe* has been overruled, section 2–202 does not provide an exception to other, broader statutory immunities, and section 2–202 is not relevant where more specific statutory immunities apply. *Id.* at 18. Again, we note that the supreme court cited *Ware*'s conclusion that 2–202 did not prevail over sections 2–105 and 2–207 in its analysis. *Id.* at 12-13. Thus, sections 2–105 and 2–207 of the Tort Immunity Act, and not section 2–202, apply in this case.

Thus, the only issue that remains to be addressed is plaintiff's contention that the immunities provided by sections 2–105 and 2–207 are inapplicable here because the City's allegedly wrongful conduct was not part of the "inspection" process. Specifically, plaintiff contends that the allegations of the City's wrongful conduct instead involved: (1) affirmatively directing Roe to undertake specific work regarding the handrails; (2) ordering a work stoppage and threatening arrest if further work was undertaken when the City's inspectors lacked lawful authority and at a time when the staircase lacked hand or side rails; and (3) ordering Roe to place yellow caution tape on the stairway. In total, these actions created an even more dangerous situation and were therefore outside the scope of the section 2–105 and section 2–207 immunities for improper inspections.

Courts have previously rejected similar contentions. For example, in *Ries* the court rejected the argument that the immunity provided by section 4–106(b) of the Tort Immunity Act did not cover the conduct of the police officers involved in the accident causing the plaintiffs' injuries. *Id.* at 10-11. The court held that this argument was "mere semantics designed to avoid a clearly applicable immunity" and accepting such a position could render section 4–106(b) a nullity. *Id.* at 11. The court reasoned as follows:

"We also assume that the legislature realized that any escaping-prisoner situation would involve pursuit by law enforcement officers. The legislature chose not to focus on the conduct of law enforcement officials in enacting this section, but rather worded it broadly to provide immunity for all injuries inflicted by escaping prisoners. Plaintiffs' injuries were inflicted by an escaping prisoner, and they cannot avoid section 4-106(b) by arguing that their case was really about something else." *Id.*

Appellate courts in this state have adopted similar reasoning with respect to the Tort Immunity Act provisions at issue here. In *Pouk v. Village of Romeoville*, 405 Ill. App. 3d 194, 196 (2010), the court was faced with allegations that the village improperly failed to advise a landowner that further actions would be necessary to resolve certain code violations and failed to institute court proceedings to compel enforcement with the village's ordinances. Nevertheless, the court found that the immunity provided by section 2–105 protected the village from liability for these allegations. *Id.* at 198.

In *Ware*, this court addressed an attempt to hold the city of Chicago liable for injuries sustained in a porch collapse. *Ware*, 375 Ill. App. 3d at 575. Among the allegations against the City,

the plaintiffs asserted that the City improperly failed to train or employ qualified inspectors, failed to ensure that its building code standards were followed, and failed to "end personal relationships with building owners that permitted custom and practice of passing noncompliant buildings as compliant." (Internal quotation marks omitted.) *Id.* at 576. The court found that all of the plaintiffs' allegations were subject to the immunities provided in the Tort Immunity Act, including sections 2–105 and 2–207. *Id.* at 582.

Finally, in *Rascher v. City of Champaign*, 262 Ill. App. 3d 592, 593 (1994), a fire caused the death of a resident of a Champaign Housing Authority property. The decedent's executor brought suit against the city of Champaign, asserting that prior to the fire the city had inspected the property, found certain hazards, but had negligently failed to advise the housing authority of those hazards. *Id.* at 596. The city claimed it was immune from this allegation pursuant to section 2–105, and the plaintiff countered by asserting that section 2–105 "provides no immunity for negligent failure to warn of hazards once discovered." *Id.* The court agreed with the city, reasoning:

"The inspection process consists of examining the property, determining whether hazards exist, and determining what notice should be given to the appropriate authorities. The determination whether a condition is a hazard cannot be separated from the determination whether a condition is a hazard sufficient to justify a warning. It would be impossible to delineate in the statute each conceivable act of negligence and to specifically immunize each one." *Id.*

We agree with the reasoning expressed in the above decisions and find that the City is immune under sections 2–105 and 2–207. By their very terms, sections 2–105 and 2–207 apply to

"inadequate or negligent" inspections. As explained above, they also extend to willful and wanton conduct associated with that activity. Prior decisions have explicitly applied these sections to acts or omissions beyond plaintiff's proposed narrow definition of an "inspection," and we see no reason why sections 2–105 and 2–207 should not apply to the conduct alleged here. It must be remembered that all of plaintiff's assertions of wrongdoing were allegedly committed by City *inspectors* while at the Summerdale building for the purposes of conducting *inspections*. Just as in *Rascher*, we do not believe that the legislature was required to delineate every conceivable act that is a part of the inspection process and specifically immunize each one. *Id.* at 596. Moreover, we will not allow plaintiff to avoid the immunities provided by sections 2–105 and 2–207 by arguing that her case "was really about something else." *Ries*, slip op. at 11.

### III. CONCLUSION

For the foregoing reasons, we hold that, under sections 2–105 and 2–207 of the Tort Immunity Act, the City is immune from liability in this case. While plaintiff's brief also addresses the potential impact of sections 2–103 and 2–205 of the Tort Immunity Act, the City has indicated its belief that those immunities are no longer relevant because plaintiff has not continued to rely upon the specific allegations to which those sections would apply. Because we have found that sections 2–105 and 2–207 provide the City with complete immunity to plaintiff's allegations, we need not further address these issues. See *DeSmet*, 219 Ill. 2d at 509; *Anthony*, 382 Ill. App. 3d at 988. The circuit court's award of summary judgment in favor of the City is therefore affirmed.

Affirmed.

No. 1-08-1653

REBECCA HESS,

        Plaintiff-Appellant,

v.

RONALD FLORES, Individually and d/b/a Flores Properties Inc., CHARLOTTE K. FLORES, a/k/a Charlotte K. Klink,

        Defendants

(The City of Chicago,

        Defendant-Appellee).

No. 1-08-1653
Appellate Court of Illinois
First District, FIRST DIVISION
March 31, 2011

JUSTICE ROCHFORD delivered the opinion of the court:
HALL, P.J., and HOFFMAN, J., concur with the judgment and the opinion.

Appeal from the
Circuit Court of Cook County
Elizabeth Budzinski,
Judge Presiding

Counsel for Plaintiff-Appellant:
Law Offices of Jeffrey Neslund
150 N. Wacker Drive, Ste. 2450
Chicago, Illinois 60606

Jeffrey Neslund
OF COUNSEL

Delgado Adams Robertson & Tiernan, P.C.
53 West Jackson Boulevard
Chicago, Illinois 60604

Robert Robertson
OF COUNSEL




Counsel for Defendant-Appellee:
Corporation Counsel of the City
30 North LaSalle Street, Ste. 800
Chicago, Illinois 60602

Chief Asst. Corporation Counsel
Myriam Zreczny Kasper
OF COUNSEL

Masterslaw
7115 West North Avenue, #296
Oak Park, Illinois 60302

Ruth F. Masters
OF COUNSEL